Jimmie L. WATKINS, Wanda Watkins, husband and wife, Plaintiffs–Appellees–Cross–Appellants,

v.

WESTINGHOUSE HANFORD COMPANY, a Washington Corporation, et al., Defendants–Appellants–Cross–Appellees.

Nos. 91–36195, 91–36233.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 1, 1993.

Decided Dec. 29, 1993.

As Amended on Denial of Rehearing and Suggestion for Rehearing En Banc March 22, 1994.

Daryl D. Jonson, Cowan, Walker, Jonson, Moore, Nickola & Heye, Richland, WA, for plaintiffs-appellees-cross-appellants.

Marvin L. Gray, Jr., Davis Wright Tremaine, Seattle, WA, for defendants-appellants-cross-appellees.

Before: TANG, FARRIS, and RYMER, Circuit Judges.

## OPINION

RYMER, Circuit Judge:

This is our second trip through the thicket of pension plans at the Hanford Nuclear Reservation (HNR). In *Carver v. Westinghouse Hanford Co.*, 951 F.2d 1083 (9th Cir. 1991), *cert. denied,* — U.S. ——, 112 S.Ct. 3036, 120 L.Ed.2d 905 (1992), we considered whether Westinghouse Hanford Company (WHC)'s Operating and Engineering Pension Plan (HOEP Plan), adopted after the consolidation of HNR's operations, improperly failed to recognize prior service for other contractors at HNC. We held that the operative plan was the formal plan adopted in December 1987, and that ERISA does not require WHC to tack the years of service

accrued for predecessor employers onto its pension plan for purposes of calculating benefits. We also suggested that if WHC had made knowing false representations or concealments of material facts, it might be equitably estopped from interpreting the plan in a manner which does not give HNR employees credit for the time they believe they deserve. *Id.* at 1087–88. It is principally this issue—whether WHC can be equitably estopped on account of misrepresentations it made to plaintiff Jimmie Watkins about aggregating prior service and thereby be required to pay benefits promised but not paid—that we must resolve in this appeal.

Following a stipulated facts trial, the district court dismissed the Watkinses' claims under the Employee Retirement Income and Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461, but found that WHC had knowingly misrepresented that all of Watkins's HNR service would be included in the calculation of his benefits. It found that all other elements of estoppel had been established and that the Watkinses were entitled to recover from WHC a lump sum reflecting past benefits promised but not received, as well as the present value of unpaid future benefits promised by WHC but not being paid under the HOEP Plan.

Both parties appeal. As the Supreme Court has recently held, equitable relief in the form of the recovery of compensatory damages is not an available remedy under 29 U.S.C. § 1132(a)(3), which the district court cited as statutory authority for the Watkinses' equitable estoppel claim. *Mertens v. Hewitt Assocs.,* —— U.S. ——, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). We have also recently held that an estoppel claim cannot result in a payment of benefits that would be inconsistent with the written plan. *Greany v. Western Farm Bureau Life Ins. Co.,* 973 F.2d 812, 822 (9th Cir.1992). As this is the effect of the relief in this case, that part of the district court's judgment cannot stand. We have jurisdiction, 28 U.S.C. § 1291, and we accordingly reverse that part of the judgment which awards damages on the Watkinses' claim for equitable estoppel. We affirm the district court's judgment on the Watkins-

es' ERISA claims and deny their request for attorney's fees on appeal.

**I**

Since the end of World War II, the United States Department of Energy (DOE) and its predecessors have operated the Hanford Nuclear Reservation in Benton County, Washington. A series of private contractors have performed work on HNR. Because changes in job functions did not always coincide with changes in private contractors, the common practice at HNR was for successor contractors to employ individuals who had worked for a predecessor contractor. The employees would perform essentially the same work at HNR; they would, however, work for a different employer.

Almost all of the private contractors had their own pension plans. This was true of the two contractors that employed Jimmie Watkins during his time at HNR: WHC and Rockwell Hanford Operations (Rockwell). Watkins worked for WHC from July 1, 1974 until July 14, 1981; during that time, Watkins obtained vested rights to accrued pension benefits under the Westinghouse Hanford Company Pension Plan (Westinghouse Plan). From August 1, 1981 until June 28, 1987, Watkins was a Rockwell employee and a participant in the Rockwell Hanford Operations Plan (Rockwell Plan). The Rockwell Plan gave Watkins no credit for his time with WHC; consequently, Watkins obtained no vested rights in accrued pension benefits under the Rockwell Plan.

In 1986, DOE decided to consolidate the primary responsibility for HNR's daily operations with one private contractor, WHC, effective June 29, 1987. On that date, Watkins was "terminated by transfer" from Rockwell to WHC, and he again became a WHC employee.

Prior to the consolidation, WHC determined that the assets of the private contractors' pension plans should be merged into a single, site-wide pension plan, the HOEP Plan. The HOEP Plan was a "High Five" plan—one in which the benefits paid out would equal a percentage of the employee's compensation over her or his highest five compensation years times the number of years of "credited service." A major issue during the reorganization was whether an

employee would receive recognition under the HOEP Plan for all of her or his years of service at HNR under all the various contractors. Because it took time to negotiate, the final HOEP Plan wasn't adopted until December 30, 1987. It was made retroactive to the June 29, 1987 consolidation date.

Soon after the consolidation, WHC announced a Voluntary Reduction in Force Program (VRF Program) for all eligible employees, including Watkins. Under the VRF Program, an employee who retired early would be entitled to receive pension benefits prior to the usual retirement age.

On October 28, 1987, Watkins wrote to WHC, requesting a calculation of his pension benefits in the event he chose to participate in the VRF Program. In particular, Watkins wanted to know whether his initial time with WHC and his time with Rockwell would be combined for purposes of computing his benefits.

By letter dated November 12, 1987, WHC informed Watkins that if he chose early retirement, all of his prior service at HNR would be combined, both for vesting and benefits-computation purposes. At the time, however, no one at WHC and no one on the Plan's Administrative Committee (Committee), the Plan's administrator, knew whether the HOEP Plan would provide for the computation of benefits based on the aggregation of all preconsolidation and postconsolidation service at HNR. WHC did not inform Watkins of this uncertainty. The district court found that neither WHC nor any of its employees "in bad faith, deliberately tried to mislead" Watkins in connection with this letter. Rather, the district court found "that the misrepresentations were due to some type of misunderstanding, miscommunication, or misinterpretation of the pending" HOEP Plan's provisions.

After he received this letter, Watkins decided to retire early from his $52,000–per–year job and participate in the VRF Program, effective January 1, 1988. On that date, Watkins received $8,030.80 in separation pay and began to receive HOEP Plan monthly pension benefits of $657.14; the calculation of Watkins's monthly benefits included all of his preconsolidation service at HNR.

On May 10, 1988, WHC announced another round of workforce reduction programs, including the Special Voluntary Retirement Program (SVR Program). The SVR Program offered eligible employees an additional three years of age and three years of service for purposes of computing pension benefits, as well as an additional $250 monthly "bridge" payment until the age of Social Security eligibility. WHC made the SVR Program available to former employees, including Watkins, who participated in the VRF Program, provided those employees would refund to WHC the amount they received in separation pay.

On August 1, 1988, WHC informed Watkins that if he were to participate in the SVR Program, his new monthly benefits would total $1,023.93, exclusive of the $250 "bridge" payment. WHC continued to include Watkins's preconsolidation service with WHC and Rockwell in its calculation of monthly benefits. As of August 1, 1988, however, the Committee had determined that the HOEP Plan's express provisions recognized prior service only to the extent that prior service was recognized under the pension plan of the employer for which the employee worked immediately prior to the consolidation. As of the same date, at least one Committee member, Michael Byrd, WHC's Pensions & Savings Investments Manager, was aware that Watkins's monthly benefits were computed based on all of his preconsolidation HNR service, in contravention of the HOEP Plan. However, Byrd took no action at the time to correct the situation. The district court found this was a knowing misrepresentation.

On August 29, 1988, Watkins elected to participate in the SVR Program and refunded the $8,030.80 he had received in separation pay. He then began receiving enhanced monthly pension benefit payments.

On May 17, 1989, Byrd notified Watkins that his HOEP benefits had been calculated erroneously to include his preconsolidation years with WHC (1974 through 1981). Byrd informed Watkins that, although his monthly payments would include a $213.51 annuity payable under the Westinghouse Plan, Watkins's monthly payments under the HOEP Plan would be reduced to reflect the fact that his initial WHC years did not count as "cred-

ited service." Watkins never was asked to refund (and he never has refunded) any HOEP Plan benefits he received prior to May 17, 1989.

Watkins appealed the recalculation of his pension benefits to the Committee. On August 3, 1989, the Committee denied the appeal. The Watkinses then filed this lawsuit, alleging that WHC was estopped to change Watkins's original benefits calculation; WHC had failed to interpret the Plan in accordance with ERISA; and WHC had failed to interpret the Plan in accordance with its express provisions.

The district court ruled in the Watkinses' favor on their estoppel claim, but in WHC's favor on the remaining claims for relief. It held that the HOEP Plan, as it was finally adopted and amended, was the "sole document to be interpreted." Applying a heightened standard of review, the court concluded the Watkinses had failed to establish that WHC incorrectly denied paying Watkins's claim for benefits.

## II

On their appeal, the Watkinses argue that WHC and the district court erred because WHC's November 12, 1987 letter established an ERISA plan. They also argue that the Westinghouse Plan and the Rockwell Plan were merged into and continued as a part of the HOEP Plan. As a result, they contend, WHC was obliged either as successor employer to Rockwell or under the old Westinghouse Plan to restore and aggregate Watkins's prior service with WHC for purposes of calculating his HOEP Plan benefits as well as for vesting, accrual, and other purposes. Further, assuming that the operative plan is comprised of the November 12, 1987 letter, the Westinghouse Plan document, the Rockwell Plan document, and the HOEP Plan document, the Watkinses contend that the Committee abused its discretion in two respects: first, by decreasing Watkins's pension in May, 1989—and retroactively ending accrual of benefits under the Westinghouse and Rockwell Plans as of the date of consolidation—without the formal action which is required for plan amendments; and second, by changing its interpretation of the plan so as to disregard noncontiguous credited ser-

vice prior to consolidation in the calculation of pension benefits. Alternatively, the Watkinses argue that the HOEP Plan itself requires calculation of early retirement allowances on the basis of "credited service," which in their view includes prior service for Westinghouse. Finally, they urge that to deny pre-break benefits as the Committee did contravenes ERISA because 29 U.S.C. § 1060 requires aggregation of pre-break and post-break service.

WHC responds that the district court correctly found that the HOEP Plan document is the only applicable plan. Under the HOEP Plan, benefits depend on the years of credited service determined in accordance with the plan of the employer for which the participant last worked—Rockwell, in Watkins's case. Because the Rockwell Plan gives no credit for Westinghouse service, Watkins's 1974–1981 Westinghouse service may not be included for purposes of applying the HOEP final pay formula. However, WHC notes, the old Westinghouse and Rockwell Plans remain in effect for purposes of paying benefits accrued under them. Thus, Watkins continues to receive vested benefits under the old Westinghouse Plan based on its "career average" formula; and he continues to receive benefits for his Rockwell and postconsolidation service under the HOEP Plan formula. For this reason, WHC contends, there was no "decrease" in benefits and the damages awarded amount to a windfall to Watkins.

## A

Much of the Watkinses' appeal on their ERISA claims follows from Carver, which involved a group of employees who, like Watkins, thought the HOEP Plan improperly failed to credit all of their preconsolidation service at HNR. Carver held that the interim plan descriptions did not establish a plan and that there was no HOEP Plan until December, 1987 when it was formally adopted. We also read the preliminary summary booklets as being consistent with the HOEP Plan itself, providing that no credit for benefit purposes would be given for prior years of HNR service unless such service would have been recognized by the plan in which the employee participated immediately before consolidation.

■ The Watkinses try to distinguish their case from *Carver* because of their personal exchange of correspondence with WHC, and urge us to follow the Eleventh Circuit's decision in *Williams v. Wright*, 927 F.2d 1540 (11th Cir.1991), which held that a letter to the company's longtime general manager outlining the benefits and procedures to be followed in connection with his retirement created an ERISA plan. *Id.* at 1544–45. We need not decide whether to embrace *Williams*, however, because the letters WHC wrote to Watkins contain none of the details about beneficiaries, source of financing, or procedures for paying and administering benefits that are necessary to create an ERISA plan.[1] *See Carver*, 951 F.2d at 1086. The November 12, 1987 letter simply informed Watkins, incorrectly, that if he chose early retirement under the VRF Program all his prior service at HNR would be combined for vesting and benefits-calculation purposes. Nor was that letter the only writing that had anything to do with Watkins's retirement, as was the case with the employee in *Williams;* there were summary booklets anticipating the HOEP Plan and eventually, a detailed, comprehensive written plan. Even though the correspondence turned out to be inconsistent with the Plan ultimately adopted (unlike the summary booklets in *Carver* which were consistent with the HOEP Plan), the fact that the letters were mistaken cannot on that account alone create an ERISA plan. Otherwise, every communication about prospective benefits could create a unique plan for a single participant who is not differently situated from fellow employees for whom the plan is established. Such a result would run counter to ERISA's overriding interest in avoiding side agreements that deviate from a plan applicable to all employees. *See, e.g., Rodrigue v. Western & S. Life Ins. Co.*, 948 F.2d 969, 971 (5th Cir.1991) ("ERISA's writing requirement protects the plan's actuarial soundness by preventing plan administrators from contracting to pay benefits to persons not entitled to them under the express terms of the plan."). Finally, as we said in *Carver*, " 'it is the reality of a plan, fund or program and not the decision to extend certain benefits that is determinative.' " 951 F.2d at 1087 (quoting *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir.1982) (en banc)). In Watkins's case as in the case of the HNR employees in *Carver*, "[t]he plan simply was not a reality until that December [1987] when it was formally adopted." *Id.*

■ The Watkinses argue another point not specifically addressed in *Carver*, that the HOEP Plan, by its express terms, adopts and incorporates both the Westinghouse Plan and the Rockwell Plan which together require that Watkins's HOEP benefits be based on all his previous periods of service. Their first argument, that the Rockwell Plan requires aggregation of service because Watkins was "terminated for transfer" fails because Watkins did not "transfer" to Rockwell from Westinghouse; his employment at Westinghouse was terminated. The Watkinses' more compelling argument is that the Westinghouse Plan was merged into and maintained as part of the HOEP Plan after consolidation. There is no dispute about this, or about the fact that the HOEP Plan Preamble provides that, as of the effective date, June 29, 1987, "each Predecessor Employer [Rockwell, in Watkins's case] ceased its employment of the Eligible Employees and they became employed by [WHC]. Westinghouse Hanford Company became successor employer under the Predecessor Plans of the Predecessor Employers and the assets of the Predecessor Plans were merged into the Plan." The parties disagree, however, about what these facts signify.

The Watkinses argue that because the Westinghouse Plan was maintained as part of the HOEP Plan, it stayed alive in all respects including its provision that for vested employees, service prior to a break in service is restored upon the date of reemployment with WHC for purposes of vesting, benefit accrual, and calculating and paying benefits. Neither the fact that the Westinghouse Plan was

---

1. ERISA requires that "[e]very employee benefit plan ... be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). Each such plan must (1) provide a policy and a method for funding the plan, (2) describe a procedure for plan operation and administration, (3) provide a procedure for amending the plan, and (4) specify a basis for payments to and from the plan. *Id.* § 1102(b).

"merged into and maintained" as part of the HOEP Plan nor the language relied upon in the Preamble, however, indicates that the *terms* of the Predecessor Plans were to be integrated into the HOEP Plan; rather, WHC was to succeed to the status of employer under those plans so that it could assume responsibility for administering the existing pension funds and see to it that vested benefits under previous plans continue to be paid. To that end, the assets of Predecessor Plans—money held in trust to pay accrued benefits—were merged into the HOEP Plan.

Accordingly, we see no reason to depart from *Carver*'s conclusion or to disagree with the district court that there was no "interim plan" and that the only applicable plan is the HOEP Plan adopted in December, 1987. The district court correctly held that the HOEP Plan became the sole document to which reference should be made in determining postconsolidation pension benefits.

**B**

The Watkinses next argue that the HOEP Plan itself requires aggregation of all of Watkins's preconsolidation service at HNR. They start from the premise that Watkins had "credited service" under the HOEP Plan by reason of his prior WHC service. Since Watkins had a nonforfeitable right to an accrued benefit as of consolidation and as of the date of his retirement, they contend that Article 4.2 of the HOEP Plan requires payment of an early retirement allowance based on that "credited service."[2] In their view, crediting of prior service with Westinghouse and Rockwell for benefits-calculation purposes is required, as the HOEP Plan "High Five" determination makes no distinction between compensation received before and after consolidation.

**2.** Article 4.2, entitled "Early Retirement Allowance," provides as follows:

A participant who has attained age 55 and received credit for 10 Years of Service under Article 6 shall be entitled to retire upon any first day of the month following his 55th birthday, which day shall be his early retirement date and to receive an Early Retirement Allowance. A Participant's Early Retirement Allowance shall be equal to his Accrued Benefit reduced one-half of one percent (½%) per month for each month his Early Retirement

WHC counters that the benefit formula in Article 4.1 of the HOEP Plan is based on "years of credited service," which Article 3.2(a) requires be determined in accordance with the plan of the employer for which the participant last worked—i.e., Rockwell. Because the Rockwell Plan gave no credit for Westinghouse service, WHC contends that Watkins's prior Westinghouse service may not be included in "credited service" for purposes of applying the HOEP "High Five" formula. We agree.

**1**

When reviewing an administrator's interpretation of an ERISA plan, we apply de novo review "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989); *Dytrt v. Mountain State Tel. & Tel. Co.,* 921 F.2d 889, 894 (9th Cir.1990). When such discretion exists, the arbitrary and capricious standard applies. *Dytrt,* 921 F.2d at 894. "[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone,* 489 U.S. at 115, 109 S.Ct. at 956 (internal quotation marks and alteration omitted); *see also Bogue v. Ampex Corp.,* 976 F.2d 1319, 1325 n. 29 (9th Cir.1992) ("Because the great deference accorded a plan administrator arises in part from the assumption of trust law that the trustee has no pecuniary interest in his decisions, proof that the trustee *does* have such interest correspondingly strengthens the court's level of review."), *cert. denied,* —— U.S. ——, 113 S.Ct. 1847, 123 L.Ed.2d 471 (1993).

Date is earlier than age 62. Effective January 1, 1988, the reference in the foregoing sentence to age 62 shall be changed to age 60. If a Participant elects to leave the employ of an Employer after attaining age 62 with not less than 10 Years of Service, credited under Article 6 he may elect early retirement and his Early Retirement Allowance shall be equal to his Accrued Benefit. Effective January 1, 1988, the reference in the foregoing sentence to age 62 shall be changed to age 60.

■ The HOEP Plan delegates to the Committee the discretionary authority to interpret·the Plan's provisions. However, the district court properly reviewed the Committee's interpretation under heightened scrutiny, since almost all the Committee members are WHC management employees. *Firestone*, 489 U.S. at 115, 109 S.Ct.. at 956.

In addition, the Watkinses submit that no deference is due to the Committee's decision because that decision was mandated by DOE. We do not need to resolve this issue, however, because the record does not support the Watkinses' argument. Although it is undisputed that WHC disagreed with DOE during the consolidation negotiations in 1987 about how the postconsolidation plan should calculate "credited service," once the HOEP Plan was adopted, there is no evidence that DOE influenced the Committee's interpretation of the Plan when it determined Watkins's benefits in 1989. In any event, no matter whether the Committee's determination ·is reviewed de novo or with some deference (factoring in the conflict of interest under which it was operating), we agree with its interpretation.

**2**

■ The Watkinses' position turns on the HOEP Plan provisions that define "credited service." Article 1.6 defines "credited service" as "service credited pursuant to Article 3." Article 3.2, in turn, provides in pertinent part:

> Credited Service prior to the Effective Date will be given in accordance with the following rules:
>
> (a) A Participant in the employ of an Employer on the Effective Date *will receive credit hereunder for service prior to the Effective Date pursuant to the rules of the Predecessor Plan of the employer for which he last worked....*

(Emphasis added.) We agree with the district court that the phrase "employer for which he last worked" is properly interpreted in Watkins's case to be Rockwell. It is undisputed that the Rockwell Plan gave Watkins no credit, either for benefits-calculation or vesting purposes, for his prior service at Westinghouse. The parties also agree that Watkins had a nonforfeitable accrued benefit on June 29, 1987, by reason of his prior period of service with WHC.

Based on these facts, the Watkinses suggest a number of different reasons why the Committee's interpretation conflicts with the HOEP Plan, but all of these reasons boil down to the point that the "credited service" and "accrued benefit" provisions pick up prior service for purposes of calculating benefits. The Watkinses' bottom line is that pre-break-in-service work for Westinghouse must be put together with postconsolidation service such that all benefits are "accrued" under the HOEP Plan formula instead of partly under the old Westinghouse Plan "career average" formula (for Watkins's 1974–1981 Westinghouse service) and partly under the new HOEP "High Five" formula (for post-consolidation WHC service). We agree with the district court that the HOEP Plan was not misinterpreted by the Committee. The HOEP plan is reasonably construed to mean that Watkins had accrued benefits under the Westinghouse Plan (a fact WHC never has contested), and that Watkins's prior service would be credited for purposes of vesting but not for purposes of the formula to be applied.

Finally, the Watkinses submit that the Committee erred by choosing an interpretation that favors the Plan, instead of the one urged by Watkins that was favorable to him, because a plan administrator is required to act in the best interest of participants. This argument is unavailing as the Watkinses' interpretation depends on the existence of an "interim plan" or a plan which consists of the November 12, 1987 letter, the Westinghouse Plan, the Rockwell Plan, and the HOEP Plan, which we have already held is not the case.

**· C ·**

■ The Watkinses finally contend that the Committee's interpretation of the HOEP Plan as not allowing aggregation of Watkins's preconsolidation service violates a number of ERISA provisions, particularly its notice and break-in-service rules. They complain that the HOEP Plan reduced accrued benefits under the Westinghouse and Rockwell Plans because it retroactively ended accrual of benefits under those plans as of June 28, 1987, without complying with ERISA's amendment procedures. The Watkinses also

argue that under ERISA, once an employee has achieved any percentage of vesting, all of his pre-break and post-break service must be aggregated for all purposes. This latter argument is foreclosed by *Carver*, where we held that there is nothing in ERISA relating to the amount of benefits to be calculated into a plan formula. 951 F.2d at 1088. The Watkinses' other arguments are also unavailing, given our conclusion that there was no "interim plan" and that the Westinghouse and Rockwell plans were not part of the HOEP Plan for any purpose other than administering previously accrued and vested benefits. There was, accordingly, no amendment.

Section 1054(g)(1) provides that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(c)(8) . . . of this title."[3] Section 1082(c)(8), in turn, requires that notice of the proposed amendment be given to the Secretary of Labor, and that the Secretary either approve or, within 90 days, fail to disapprove the amendment.

It is undisputed that notice of the Watkins benefit decision was not given to the Secretary of Labor. The Watkinses argue that the decision therefore violates ERISA, as it was an "amendment" that decreased Watkins's "accrued benefit." But an "accrued benefit" could have been "decreased" only if the Westinghouse Plan (which aggregates all Westinghouse service) is the operative postconsolidation plan document *and* if the HOEP Plan's "High Five" formula springs backward to merge Watkins's 1974–1981 Westinghouse service into his postconsolidation WHC service so as to make benefits for the entire period of Westinghouse service accrue at the HOEP Plan formula level. That simply isn't what happened.

Watkins's benefits under the Westinghouse Plan for his initial period of service have not been reduced. They were calculated under the "career average" formula of that Plan. Watkins's post-June 29, 1987 benefits were

calculated under the *HOEP Plan* and its "High Five" formula. As we have held, the Westinghouse Plan did not merge into the HOEP Plan and require linkage of service at the higher HOEP rate.

The Watkinses also argue that the Committee violated 29 U.S.C. § 1054 by changing the interpretation of what qualified as "credited service" under the Plan. Again, this argument fails because the Committee never reduced any of the benefits Watkins already had accrued. The changed interpretation did result in lower monthly benefit payments, but only for *future* payments. This does not run afoul of ERISA.

While ERISA sets forth strict guidelines on rights that may not be forfeited (i.e., vested rights) and benefits that may not be decreased (i.e., accrued benefits), "courts have uniformly relied on *Alessi* [*v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 511–14, 101 S.Ct. 1895, 1900–01, 68 L.Ed.2d 402 (1981),] to uphold the formulas by which employers compute the amount of their employees' benefits, so long as the pension plans in question satisfy ERISA's guidelines." *Williams v. Caterpillar, Inc.,* 944 F.2d 658, 664 (9th Cir.1991). Because the Committee's interpretation did not take away benefits Watkins had accrued, the Committee's actions did not violate § 1054.[4]

The Watkinses cite no authority for their claim that ERISA *requires* that WHC aggregate all of Watkins's preconsolidation service for purposes of calculating his benefits. Instead, they rely on a single sentence from the House Conference Report that accompanied ERISA: "[O]nce an employee has achieved any percentage of vesting, then all of his pre-break and post-break service must be aggregated for all purposes." H.R.Conf.Rep. No. 1280, 93d Cong., 2d Sess. 14, *reprinted in* 1974 U.S.C.C.A.N. 5038, 5051. Their reliance is misplaced, however, as the ERISA section that comes closest to embodying the "rule" described in the House Conference Report is 29 U.S.C. § 1060—and it does not require aggregation for purposes of calculating benefits.

---

**3.** Section 1054(g)(1) also requires compliance with 29 U.S.C. § 1441. Section 1441 deals with terminated plans and does not apply in this case.

**4.** For these same reasons, the Watkinses' arguments based upon Article 19 of the HOEP Plan

and § 8.1 of the Westinghouse Plan, both of which prohibit amendments that reduce an employee's accrued benefits, are without merit.

Section 1060 provides in pertinent part: For purposes of this part [2] and part 3 [of ERISA]—

(1) in any case in which the employer maintains a plan of a predecessor employer, service for such predecessor shall be treated as service for the employer....

29 U.S.C. § 1060(b)(1). This rule of aggregation applies only to parts 2 and 3 of ERISA, *id.* §§ 1051–1086. As we said in *Carver*, these parts of ERISA "establish minimum requirements for participation, vesting, funding, and rate of accrual of benefits. There is nothing in these provisions relating to the amount of benefits to be calculated into the plan formula." 951 F.2d at 1088 (citations omitted).

The HOEP Plan's *eligibility* provision, Article 2.2(c), aggregates all preconsolidation service, thereby complying with § 1060(b)(1). *Carver* makes it clear that § 1060 does not mandate that the plan calculate *benefits* based on complete aggregation of service. The district court properly rejected the Watkinses' ERISA claims.

## III

We turn now to WHC's appeal and the Watkinses' cross-appeal of the district court's equitable estoppel rulings. The district court held for the Watkinses on their equitable estoppel claim against WHC, but not against the Plan. WHC argues that the Watkinses' equitable estoppel claim has no merit in light of the Supreme Court's recent decision in *Mertens v. Hewitt Associates,* —— U.S. ——, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). We agree.

Before *Mertens,* we had said that "[e]ven though ERISA preempts common law theories of contract law, the principles of equitable estoppel apply to pension plans." *Dockray v. Phelps Dodge Corp.,* 801 F.2d 1149, 1155 (9th Cir.1986) (citation omitted); *see also Carver,* 951 F.2d at 1087–88; *Ellenburg v. Brockway, Inc.,* 763 F.2d 1091, 1096 (9th Cir.1985). At the same time, we have limited the circumstances in which an ERISA claimant may assert an equitable estoppel claim. In *Davidian v. Southern California Meat Cutters Union & Food Employees Benefit Fund,* 859 F.2d 134 (9th Cir.1988), we held

that an estoppel claim will not lie against a trust fund where recovery on the claim would contradict written plan provisions. *Id.* at 136. And in *Greany v. Western Farm Bureau Life Insurance Co.,* 973 F.2d 812 (9th Cir.1992), we held that "a federal common law claim of equitable estoppel will be available only where '(a) the provisions of the plan at issue are ambiguous such that reasonable persons could disagree as to their meaning or effect, and (b) representations are made to the employee involving an oral interpretation of the plan.'" *Id.* at 821 (quoting *Kane v. Aetna Life Ins.,* 893 F.2d 1283, 1286–87 (11th Cir.), *cert. denied,* 498 U.S. 890, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990)).

In *Mertens,* the Court considered whether a nonfiduciary who knowingly participates in the breach of a fiduciary duty under ERISA can be liable for losses that a plan suffers as a result. The Court first reviewed the remedies available under § 1109(a) against fiduciaries (which WHC is in this case):

[T]he fiduciary is personally liable for damages ("to make good to [the] plan any losses to the plan resulting from each such breach"), for restitution ("to restore to [the] plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary"), and for "such other equitable or remedial relief as the court may deem appropriate."

113 S.Ct. at 2066 (second and third alterations in original) (quoting 29 U.S.C. § 1109(a)). Because the party from whom money damages was sought in *Mertens* was not a fiduciary, however, the claimant sought to premise relief on § 1132(a)(3), which authorizes a participant to bring a civil action "(A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan." 29 U.S.C. § 1132(a)(3). This required the Court to interpret "appropriate equitable relief" and to decide whether it encompasses compensatory damages. The Court held that the term "other appropriate equitable relief" encompasses *only* the traditional forms of equitable relief, i.e., an injunction, mandamus, or restitution. —— U.S. at —— ——, 113 S.Ct. at 2068–70. The district court in this case believed that § 1132(a)(3) provides the statutory authority for the Wat-

kinses' equitable estoppel claim. After *Mertens,* such a reading is untenable.[5]

█ *Mertens* requires the Watkinses to identify one of ERISA's six civil enforcement provisions that authorizes the recovery of damages on their equitable estoppel claim. They first argue that § 1132(a)(1) provides the statutory authority. Section 1132(a)(1)(B) authorizes actions by participants or beneficiaries "to recover benefits due ... *under the terms of [the] plan,* to enforce ... rights *under the terms of the plan,* or to clarify ... rights to future benefits *under the terms of the plan*[.]"[6] (Emphasis added.) The Watkinses insist that the relevant "plan" for ERISA purposes consists of the initial correspondence from WHC; an amalgamation of the Westinghouse, Rockwell, and HOEP Plans; or a merger of the HOEP Plan and the Westinghouse Plan's break-in-service rules. For reasons we have already discussed, however, the terms of Watkins's ERISA plan are found exclusively in the HOEP Plan document. *See* pp. 1522–24, *supra.* As we have already held that the unambiguous terms of the HOEP Plan do not allow for aggregation of all of Watkins's preconsolidation service at HNR, pp. 1524–26, *supra,* an equitable estoppel claim will not lie under the first prong of *Greany. See* 973 F.2d at 821.

Section 1132(a)(2) authorizes a civil action by "a participant ... for appropriate relief under § 1109[.]" Section 1109, in turn, "makes fiduciaries liable for breach of [their] duties, and specifies the remedies available against them[,]" including damages. *Mertens,* —— U.S. at ——, 113 S.Ct. at 2066. But § 1132(a)(2) does not provide the authority for the Watkinses' equitable estoppel claim, since § 1109 only allows recovery that "inures to the benefit of the plan as a whole." *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 140, 105 S.Ct. 3085, 3089, 87 L.Ed.2d 96 (1985); *see also id.* at 144, 105 S.Ct. at 3091 ("[T]he entire text of [§ 1109] persuades us that Congress did not intend that section to authorize any relief except for the plan itself.").

Nor do ERISA's three remaining civil enforcement provisions plainly authorize the recovery of damages on the Watkinses' equitable estoppel claim.[7] Therefore, because ERISA does not sanction the recovery of damages as the district court held, we must reverse the judgment in the Watkinses' favor.[8]

**IV**

█ The Watkinses ask for their attorney's fees on appeal pursuant to 29 U.S.C. § 1132(g)(1). This section "allows for the recovery of attorney's fees and costs incurred in an appeal regardless of the outcome." *Oster v. Barco of Cal. Employees' Retirement Plan,* 869 F.2d 1215, 1221 (9th Cir. 1988). The award of attorney's fees and costs is a matter committed to the court's discretion. 29 U.S.C. § 1132(g)(1). In exercising that discretion, we consider the following criteria:

(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative legal merits of the parties' positions.

---

5. It makes no difference that the Watkinses' claim is equitable in nature. The Court in *Mertens* looked to the substance of the remedy sought (i.e., injunction versus damages) rather than the label placed on that remedy. *See* —— U.S. at ——, 113 S.Ct. at 2068 ("Although they often dance around the word, what petitioners in fact seek is nothing other than compensatory *damages* —monetary relief for all losses their plan sustained as a result of the alleged breach of fiduciary duties.").

6. Section 1132(a)(1)(A) provides for an enforcement action against administrators who refuse to comply with requests for information that ERISA requires administrators to supply.

7. Section 1132(a)(4) authorizes a suit for violation of § 1025(c), which mandates that plan administrators furnish participants with certain information contained in Internal Revenue registration statements. Sections 1132(a)(5) and (a)(6) authorize actions only by the Secretary of Labor.

8. Our holding on WHC's appeal obviates the need to consider the Watkinses' cross-appeal of the district court's ruling that the Plan itself could not be sued under an equitable estoppel theory.

*Oster*, 869 F.2d at 1222 (internal quotation marks omitted).

We deny the Watkinses' request for attorney's fees. Of the factors listed in *Oster*, only the second cuts in favor of the request: it is undisputed that WHC can absorb the hit of a fee award. The remaining factors either cut against the request or simply do not weigh heavily on either side of the balance. The district court specifically found that WHC did not act in bad faith. The deterrence effect of a fee award in this case would be minimal. The Watkinses brought this appeal to benefit only themselves. Finally, we have held adversely to the Watkinses on all theories they advanced.

**AFFIRMED IN PART, REVERSED IN PART.**

Each side shall bear its own costs.

### ORDER

March 22, 1994.

The opinion filed December 29, 1993, slip op. 14589, and appearing at 12 F.3d 1517 (9th Cir.1993), is amended as follows:

[Editor's Note: Opinion amended for purpose of publication.]

With these amendments, the panel has voted unanimously to deny the petition for rehearing. Judges Farris and Rymer vote to reject the suggestion for rehearing en banc, and Judge Tang recommends rejection of the suggestion for rehearing en banc.

The full court has been advised of the suggestion for rehearing en banc, and no active judge has requested a vote on whether to rehear the matter en banc. Fed.R.App.P. 35.

The petition for rehearing is DENIED and the suggestion for rehearing en banc is REJECTED.

* The Honorable A. Wallace Tashima, United States District Judge for the Central District of Califor-