Anna JULIA, Plaintiff–Appellant,

v.

BRIDGESTONE/FIRESTONE, INC.; Bridgestone/Firestone, Inc. 1984 Retirement Plan; Delmar F. Lohr, Defendants–Appellees.

No. 02–4376.

United States Court of Appeals, Sixth Circuit.

May 27, 2004.

John L. Wolfe, Akron, OH, for Plaintiff–Appellant.

Brian A. Lapps, Frances C. Fenelon, Waller, Lansden, Dortch & Davis, Nashville, TN, Hamilton DeSaussure, Jr., William D. Dowling, Oldham & Dowling, Daniel M. Walpole, Akron, OH, for Defendants–Appellees.

Before: BATCHELDER and MOORE, Circuit Judges, and CALDWELL,* District Judge.

_____

* The Honorable Karen K. Caldwell, United States District Judge for the Eastern District of Kentucky, sitting by designation.

## OPINION

MOORE, Circuit Judge.

Plaintiff–Appellant Anna M. Julia ("Julia") appeals from the district court's judgment in favor of the Defendants–Appellees, Bridgestone/Firestone, Inc. ("Bridgestone"), Bridgestone/Firestone, Inc.1984 Retirement Plan ("the Plan"), and Delmar F. Lohr ("Lohr"), Julia's ex-husband, partially on the pleadings and partially after a motion for summary judgment. Julia's claims under ERISA arose from a miscalculation by Bridgestone of the amount owed Julia under the divorce agreement between her and Lohr and the subsequent overpayment of Julia and underpayment of Lohr. Julia complains of detrimental reliance on the overpayment and asks for a judgment in the form of both reimbursement for each month since Bridgestone corrected the amount and future guarantee of that monthly amount. Because Julia did not reasonably rely on Bridgestone's misrepresentations, she can recover under none of her theories. Assuming her other claims fail, she also complains of the district court's failure to decide the proper amount owed to her under the divorce agreement; while we agree that the district court should have decided the issue, we disagree with Julia's argument on its merits, and we therefore AFFIRM the district court's judgment.

### I.

Julia and Lohr were married January 2, 1978, and divorced in April 1999. Before and during the marriage, Lohr was a chemist with Bridgestone; he started work on August 1, 1965 and retired on February 1, 1994. As part of the divorce, Lohr and

Julia agreed that she would receive a portion of his pension benefit. This agreement was codified in a Qualified Domestic Relations Order ("QDRO"), which assigned to Julia

an amount equal to **Fifty Percent (50%) of the Marital Portion of the Participant's Accrued Benefit** under the Plan as of the Participant's benefit commencement date. The Marital Portion shall be determined by multiplying the Participant's Accrued Benefit by a fraction (less than or equal to 1.0), the numerator of which is the number of months of the Participant's participation in the Plan earned during the marriage (**from January 2, 1978 to April 15, 1999**) and the denominator of which is the total number of months of the Participant's participation in the Plan as of his date of cessation of benefit accruals, commencing **October 1, 1999**. . . .

Joint Appendix ("J.A.") at 35–36 (QDRO). Lohr's total benefit was $1,541.18 monthly; the Marital Portion was later calculated by Bridgestone as $865.22, although Julia challenges that calculation as well, as detailed below. Julia then should have received under the QDRO half of that amount, or $432.61. The QDRO was submitted to Bridgestone, which represented to Lohr and Julia that it could be honored as qualified. However, in calculating Julia's portion of Lohr's pension benefit, Bridgestone apparently concluded that because Lohr was already retired and receiving pension payments at the time of the divorce, his election for Qualified Joint & Survivor benefits at retirement trumped the QDRO, and Julia was entitled to a full half of Lohr's pension. Julia was notified by Bridgestone on October 11, 1999, that she would receive $770,59. This letter makes no reference to the QDRO. When Julia began receiving her portion of benefits, Lohr's benefits were of course reduced in kind. When Lohr received his

first check for $770.59, he called Julia and told her she was receiving too much money and that she should have her attorney correct the problem. At roughly the same time, on November 19, 1999, Lohr's attorney sent a letter to Julia's divorce counsel stating that the Plan had erred in its calculations. The letter states Bridgestone's theory that the election at the time of retirement controlled even with a qualifying DRO. Julia claims she contacted Bridgestone twice during this time and was told that the pension calculation was correct. On April 17, 2000, Bridgestone contacted Julia and informed her that the pension calculation was incorrect. On April 24, Bridgestone sent a letter confirming that telephone conversation and setting out a schedule for the recoupment of the overpayment. Later that year, however, Lohr and Julia reached an agreement in state court which settled the overpayment (which was due to Lohr, rather than the Plan), which Bridgestone had requested they do.

Julia claims detrimental reliance on Bridgestone's representations with regard to her purchase of long-term health coverage and of Lohr's interest in their marital home. She purchased the health insurance on January 14, 2000; the policy required quarterly payments of $413.54. She applied for a loan to purchase the home on April 5, 2000, which was approved on April 6, 2000. While that is prior to Bridgestone's realizing its error and contacting Julia, nonetheless on May 2, 2000, after the phone call between Julia and Bridgestone on April 17, 2000, Julia's attorney sent a letter to Lohr's attorney stating that Julia was electing to purchase the home pursuant to the divorce decree. Additionally, it was not until May 23, 2000, that Julia actually executed the mortgage and closed the deal on the marital residence.

On April 5, 2001, Julia filed suit in federal district court under ERISA for recovery of benefits, apparently asserting that $770.59 was the correct amount, and asking for a judgment for that amount, but no equitable relief. An amended complaint was filed on August 1, 2001, expanding both the ERISA sections under which relief was sought and the relief requested. The district court granted a motion to dismiss certain of Julia's claims on the pleadings on March 28, 2002, and summary judgment on the remainder of the claims on October 30, 2002. Julia filed a motion to reconsider, which was denied on November 13, 2002. She now appeals to this court, claiming numerous errors in the magistrate judge's decisions.[2]

## II.

The granting of motions to dismiss and for summary judgment is reviewed de novo by this court. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 518 (6th Cir.2001); *Brooks v. American Broad. Cos.*, 932 F.2d 495, 500 (6th Cir.1991). The district court dismissed Julia's cause of action under 29 U.S.C. § 1132(a)(3) at the pleadings stage; she claims that this decision was in error. The district court correctly noted that a plaintiff who has standing to pursue a claim for recovery of benefits under 29 U.S.C § 1132(a)(1)(B) cannot pursue a claim for equitable relief under § 1132(a)(3), which instead operates as a catchall for plaintiffs not otherwise provided for under § 1132. *See Varity Corp. v. Howe*, 516 U.S. 489, 512, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996); *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 615–16 (6th Cir.1998). Although Julia contests this settled principle by arguing that because her claim relies on her

QDRO, it is not controlled by ERISA, this misunderstands the district court's holding: because of ERISA's preemptive force, only causes of action under ERISA are allowed, regardless of the substance of the claim, and under ERISA law, a plaintiff who has a cause of action under § 1132(a)(1)(B) cannot pursue a claim under § 1132(a)(3), regardless of the substance of her claim.

It is not as clear, however, whether the district court correctly held that Julia had a claim under § 1132(a)(1)(B). Julia, at least at this point in the litigation, concedes the QDRO controls the pension distribution, trumping the joint-and-survivor option elected upon Lohr's retirement. In order to give Julia the relief she requests, Bridgestone would have to pay out more than Lohr is entitled to under the Plan: that is, Lohr is entitled to the full amount of his pension benefits, minus Julia's portion. If Bridgestone is forced to pay Julia more, they will be doing so above and beyond Lohr's allotted benefits. Julia is therefore, in a strict sense, not seeking to recover benefits which she is due "under the terms of the plan." Some courts have construed § 1132(a)(1)(B) strictly and refused recovery under that section in similar circumstances. *See Flint v. ABB, Inc.*, 337 F.3d 1326, 1329–30 (11th Cir.2003) (interest on delayed benefits is not "benefits under the terms of the plan" and therefore no § 1132(a)(1)(B) action lies); *Clair v. Harris Trust & Sav. Bank*, 190 F.3d 495, 497 (7th Cir.1999) (same); *Slice v. Sons of Norway*, 34 F.3d 630, 632 n. 5 (8th Cir. 1994) ("Slice is seeking none [of the remedies offered by § 1132(a)(1)(B) ] as he is admittedly already receiving all that he is entitled to under the terms of the plan"); *Hughes v. Gen. Motors Corp.*, No. 87–1506,

---

2. Both parties consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c).

1988 WL 72742, *5 (6th Cir. July 14, 1988) ("The words of [§ 1132(a)(1)(B)] ... do not give the district court jurisdiction to decide claims of this type; the claims cannot fairly be said to be claims by a participant seeking to recover benefits or enforce or clarify rights 'under the terms of the plan.'"). One court, looking at the problem, noted that § 1132(a)(1)(B) sounded in contract; where a plaintiff sought extra-contractual relief based on reliance and prejudice, that relief would be equitable and must be found under § 1132(a)(3). *See Feifer v. Prudential Ins. Co.,* 306 F.3d 1202, 1213–14 (2d Cir.2002).

As we understand Julia's action, she is seeking plan benefits, according to the terms of the Plan as represented to her by Bridgestone. It may be more appropriate under those circumstances to describe her cause of action as one sounding in § 1132(a)(1)(B) for plan benefits, where she asserts that Bridgestone is estopped from enforcing the Plan against her as written—including the incorporation of the terms of Julia and Lohr's QDRO. In this respect, it is important to consider the form of relief she seeks, which is primarily a money judgment for past alleged underpayments and future stipulation of the amount she is to receive. After *Great–West Life & Annuity Insurance Co. v. Knudson,* 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), it is unclear whether or not Julia could receive this relief under § 1132(a)(3), and whether it would be more appropriate to characterize this action as one under § 1132(a)(1)(B). Julia is seeking to take advantage of equitable estoppel, which has sometimes been considered a doctrine that can apply in § 1132(a)(1)(B) actions to estop the plan from being enforced as written, sometimes a doctrine that can be used in § 1132(a)(3) to gain similar relief, and sometimes as a free-floating common-law cause of action under ERISA. *See Feifer,* 306 F.3d at 1213–14

(extracontractual relief based on reliance and prejudice is equitable and only allowable under § 1132(a)(3)); *Katz v. Comprehensive Plan of Group Ins.,* 197 F.3d 1084, 1090 (11th Cir.1999) (equitable estoppel allowable under § 1132(a)(1)(B) in the face of ambiguous plan provisions); *Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 403–04 (6th Cir.1998) (en banc) (denying estoppel claim on facts of case without making any reference to statutory basis for claim); *Swinney v. Gen. Motors Corp.,* 46 F.3d 512, 521–523 (6th Cir.1995) (same); *Gordon v. Barnes Pumps, Inc.,* 999 F.2d 133, 137–38 (6th Cir.1993) (same). Instructive here is *Watkins v. Westinghouse Hanford Co.,* 12 F.3d 1517, 1527–28 (9th Cir.1993), which involved a plan beneficiary whose years in service had been erroneously calculated, resulting in his being misinformed as to his plan benefits and overpaid for years. Watkins had also retired early in reliance on that misinformation. The Ninth Circuit held that after *Mertens v. Hewitt Associates,* 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), even though an equitable-estoppel claim based on those facts would be a claim "equitable in nature," § 1132(a)(3) could not provide relief because the remedy sought was a legal remedy. *Watkins,* 12 F.3d at 1527–28 & n. 5. The *Watkins* court went on to hold that because the estoppel claim did *"not* seek to recover benefits 'under the terms of the' [plan at issue in *Watkins* ]," it could not be brought under § 1132(a)(1)(B). *Id.* at 1528.

Fortunately, we need not wade too deeply into this morass: whether Julia properly seeks to recover benefits under § 1132(a)(1)(B) and estop Bridgestone from deviating from its misrepresentations to her, or alternately seeks equitable estoppel under § 1132(a)(3) for a breach of fiduciary duty, her claim must fail because she cannot show reasonable reliance on

Bridgestone's misrepresentations. In order to make out a claim of estoppel under ERISA, there must be:

> 1) conduct or language amounting to a representation of material fact; 2) awareness of the true facts by the party to be estopped; 3) an intention on the part of the party to be estopped that the representation be acted on, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct is so intended; 4) unawareness of the true facts by the party asserting the estoppel; and 5) detrimental and justifiable reliance by the party asserting estoppel on the representation.

*Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1298 (6th Cir.1991) (quoting *Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210, 1217 (6th Cir.1987)). The district court found that Julia could not at the least establish the fourth and fifth elements of estoppel. With respect to the fourth, the district court held that "Julia through her attorney forwarded the QDRO and is presumed to know its terms," and that she "conceded awareness of the unexpected higher payment." J.A. at 84–85. Julia's response to this is that her attorney did not testify or present affidavits and therefore his knowledge cannot be imputed to her; as her attorney was a signatory to the QDRO, this argument is not availing. As Julia herself concedes, the QDRO is a contract between her and Lohr, the terms of which she not only must be presumed to have known, but also to have approved. She also claims that the district court was in error because her deposition testimony and her affidavit reveal her claiming to the bitter end that no mistake was made; this may be the case, but it does not erase her concession in her deposition that the pension benefits she initially received were "inconsistent with the terms of the QDRO." J.A. at 242. The district court

found that Julia could not establish the fifth element because she had not produced evidence of financial hardship: while she had demonstrated that she had purchased the home and the life insurance policy, those purchases were "prudent and beneficial," and Julia had not produced any evidence of her finances that would establish an inability to afford those purchases. The district court also noted that "Julia had received a substantial amount of income[-]producing assets in the divorce, which Julia has not revealed." J.A. at 85.

Most important, Julia's reliance was entirely *un*justifiable; at the moment Lohr received the check for the reduced amount, he called her and told her the situation. She was at that point on notice that the QDRO was not being applied to the pension benefits, and she could not be "justifiably" relying on Bridgestone's representation that that was appropriate. The QDRO division of pension benefits was part of her divorce settlement, and even if she reasonably believed Bridgestone's representations as to the inapplicability of the QDRO, she cannot reasonably have believed that she would receive this windfall without commensurate reduction in spousal support or another part of the divorce settlement. Julia does not point to any evidence in the record as to her financial situation, other than her statements that she was worried about her employment prospects and her credit rating. She merely reiterates that she relied on Bridgestone's representations, without establishing either the justifiability of that reliance or her detriment in so doing.

■ Julia's claim that the district court erred in dismissing her state-law causes of action fails as well. Julia relies on the QDRO's status as not preempted in arguing that her state-law causes of action are viable, but the only cause of action that

might survive is one to determine the proper interpretation of the QDRO as between her and Lohr. In this case, she attempts to estop an ERISA plan and plan administrator from distributing benefits in a certain way; this is clearly a cause of action which "relates to" an ERISA plan, and any state-law causes of action are therefore preempted. *See Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 139–40, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990).

■ Finally, Julia complains that the district court failed to decide whether Bridgestone's calculation of the marital portion under the QDRO was correct. She claims two sources of error in that calculation: first, that the QDRO's stated numerator for the marital portion, "the number of months of the Participant's participation in the Plan earned during the marriage," should be trumped by the inaccurate dates that follow, "from January 2, 1978 to April 15, 1999," which include time in the marriage when Lohr was not participating in the Plan; and second, that Lohr's "Accrued Benefit" under the terms of the QDRO should have included funds deducted from his pension because he took early retirement. Initially, Lohr had filed what he styled a counterclaim, which on its face indicates that it seeks declaratory relief against Bridgestone (which would have been appropriately styled as a cross-claim), but which the parties and the court below have treated as seeking declaratory relief against Julia. The district court considered this claim as one against Julia, and declined to exercise supplemental jurisdiction over a dispute over the terms of a divorce settlement. We are uncertain that this was correct, given the ambiguity in the pleading as to whether it sought relief against Julia or Bridgestone. Federal courts have jurisdiction of actions against ERISA plans and administrators to determine the meaning of the terms of a

QDRO, whether or not they lack jurisdiction over similar actions against an ex-spouse. *See Seaman v. Johnson,* 91 Fed. Appx. 465, 469–70 (6th Cir.2004); *Dorn v. IBEW,* 211 F.3d 938, 946–47 (5th Cir. 2000); *Matassarin v. Lynch,* 174 F.3d 549, 563–565 (5th Cir.1999); *Hullett v. Towers, Perrin, Forster & Crosby, Inc.,* 38 F.3d 107, 111–112 (3d Cir.1994); *Carland v. Metro., Life Ins. Co.,* 935 F.2d 1114, 1118–1119 (10th Cir.1991). The district court also refused to consider Julia's claim that Bridgestone erred in calculating the reduced pension amount, holding that this claim exceeded the issues presented in her amended complaint. On this front, however, we think the district court erred: Julia's claim fairly presents a request for declaratory and injunctive relief to clarify her benefits under the terms of the Plan and "under the terms of the QDRO," and her argument that the QDRO calculation performed by Bridgestone was wrong was in any event clearly before the district court in her reply to Bridgestone's motion for summary judgment on her § 1132(a)(1)(B) claim. There is no need, however, to remand to the district court for further proceedings, as we find Julia's substantive arguments wholly unconvincing. *See Hullett,* 38 F.3d at 111–13 (interpretation of QDRO, like any other contract construction, is question of law); *Carland,* 935 F.2d at 1120 (same).

Julia first argues that the discrepancy in the QDRO between the description of the numerator of the marital portion of the benefit and the dates in parentheses after that description should be resolved by following the dates, rather than the text. The QDRO states that the numerator of the marital portion "is the number of months of the Participant's participation in the Plan earned during the marriage **(from January 2, 1978 to April 15, 1999)."** As the overriding thrust of the document is the division of Lohr's pension based on

the portion of that pension he earned while married to Julia, we hold as a matter of law that the use of the date of divorce, rather than the date of Lohr's retirement, in the preceding passage is a scrivener's error, and the unambiguous terms of the QDRO set the numerator at 16 years, not 21.5 years.

Julia also argues that the "Accrued Benefit" language in the QDRO should be defined, based on 29 U.S.C. § 1002(23)(A), as the amount Lohr would have received had he not retired early and received a reduced pension. Section 1002(23)(A) defines accrued benefit, "in the case of a defined benefit plan, [as] the individual's accrued benefit under the plan and, except as provided in section 1054(c)(3) of this title, expressed in the form of an annual benefit commencing at normal retirement age." We find Julia's argument unconvincing for a number of reasons. First, § 1002(23)(A) is a definitional section for ERISA itself, and the QDRO does not by its terms incorporate ERISA's definitional sections. Second, as Lohr was already receiving his pension, reduced by the early retirement amount, at the time of the divorce, it is extremely unlikely and indeed illogical that the parties meant to base this division on what his pension would have been had historical events prior to the divorce not taken place. Third, even § 1002(23)(A) itself is limited by 29 U.S.C. § 1054(c)(3), which provides, "in the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age ... the employee's accrued benefit ... shall be the actuarial equivalent of such benefit." This argument fails.

We have reviewed Julia's remaining claims of error, and find them to be without merit.

## III.

For the reasons explained above, the judgment of the district court is **AFFIRMED**.