John CHITKIN and Nancy Chitkin, individually and as guardians ad litem for Danielle Chitkin, Plaintiffs,

v.

LINCOLN NATIONAL INSURANCE COMPANY, and Does 1–100, inclusive, Defendants.

LINCOLN NATIONAL INSURANCE COMPANY, Counterclaimant,

v.

John CHITKIN and Nancy Chitkin, individually and as guardians ad litem for Danielle Chitkin, a minor, Counterdefendants.

Civ. No. 90–1287–R (AJB).

United States District Court, S.D. California.

March 2, 1995.

844

David Bacon, Richard T. Davis, Jr. and Cheryl A. DeBari, Adams, Duque & Hazeltine, Los Angeles, CA, for defendants and counterclaimant.

Donald M. de Camara, El Cajon, CA, for plaintiff and counterdefendant.

AMENDED ORDER GRANTING LINCOLN NATIONAL'S MOTION FOR SUMMARY JUDGMENT ON ITS COUNTERCLAIM

RHOADES, District Judge.

This matter comes before the Court on Defendant and Counterclaimant Lincoln National Insurance Company's ("Lincoln National's") Motion for Summary Judgment on its counterclaim.[1] For the reasons given be-

1. Lincoln National's motion is its second for summary judgment on its counterclaim. This

low, Lincoln National's Motion for Summary Judgment is granted.[2]

## I. Background

On June 8, 1987, twenty-month-old Danielle Chitkin nearly drowned in a duck pond. Danielle wandered out of an open sliding glass door at the home of Ed and Judy Way while Nancy Chitkin visited with Judy Way. Danielle then made her way across the backyard, through an unlocked, unauthorized gate, and toward the duck pond, before falling into the pond. Danielle suffered severe brain damage as a result of the incident.

Lincoln National provided medical benefits to Danielle Chitkin because her father, John Chitkin, participated in a the Jerome's Furniture Warehouse Health VEBA Plan (the "Plan"). Lincoln National issued a group policy of insurance to the Plan. Lincoln National has paid claims totalling $701,048.66 under the Plan for medical treatment for Danielle.

The Plan includes a section entitled "Return of Over Payment." That section states in full:

Payment made for charges must be returned to Lincoln National if:

1. it is found that such charges were paid in error, or

2. a third party is determined to be liable for such charges.

If an individual insured under the policy has

a. medical or dental charges; or

b. loss of earnings;

as a result of the negligence or intentional act of a third party, and makes a

claim to Lincoln National for benefits under the policy for such charges or such lost earnings, the insured individual (or legal representative of minor or incompetent) must agree in writing to repay Lincoln National from any amount of money received by the insured individual from the third party, or its insurer. The repayment will be to the extent of the benefits paid by Lincoln National, but will not exceed the amount of the payment received by the individual from the third party, or its insurer. However, the reasonable expenses, such as lawyers' fees and court costs, incurred in effecting the third party payment reimbursed to Lincoln National may be deducted from the repayment to Lincoln National.

The repayment agreement will be binding upon the insured individual (or legal representative of a minor or incompetent) whether:

a. the payment received from the third party, or its insurer, is the result of:

1) a legal judgment; or

2) an arbitration award; or

3) a compromise settlement; or

4) any other arrangement; or

b. the third party, or its insurer, has admitted liability for the payment; or

c. the medical or dental charges or loss of earnings are itemized in the third party payment.

On August 20, 1987, the Chitkins entered into a settlement agreement with Ed and Judy Way for $100,000, the maximum benefits available under the Ways' homeowners insurance policy.

Court denied Lincoln National's first motion for summary judgment on its counterclaim on November 15, 1991 and granted Plaintiffs and Counterdefendants John and Nancy Chitkin's (the "Chitkins") cross motion for summary judgment on the counterclaim. The Ninth Circuit reversed this Court's November 15, 1991 Order on November 23, 1993. The Ninth Circuit remanded the case for further proceedings consistent with its Memorandum disposition after it issued an Order on March 9, 1994 amending its Memorandum. 15 F.3d 1083.

Many issues surrounding Lincoln National's motion for summary judgment center on the law of the case. This Court finds that these issues

cannot be fully understood without the full text of the Ninth Circuit's Memorandum disposition. Although the Ninth Circuit did not designate its Memorandum for publication, this Court finds it appropriate to reprint the full decision in the Appendix to this Order to elucidate issues concerning the law of the case. *See* Ninth Circuit Rule 36–3.

**2.** This Court entertained oral argument in this matter on July 18, 1994. Pursuant to Southern District of California Local Rule 7.1(d)(1), this Court finds this motion suitable for decision without further oral argument.

Beginning in late 1987, Lincoln National began to take steps to control its expenditures on behalf of Danielle Chitkin. In October 1987, for example, Lincoln National endeavored to reduce Danielle's nursing care from twenty-four to sixteen hours per day. According to the Chitkins, Lincoln National's efforts included its misrepresentation to Danielle's doctor that the Chitkins wanted to reduce Danielle's nursing care, when, in fact, the Chitkins wanted no such thing. Later, in November 1987, Lincoln National took the position that Danielle's care could be characterized as custodial only. Such a characterization again would save Lincoln National a substantial sum. Lincoln National did not retreat from its "custodial care" position until January 1989. In October 1988, an attorney for Lincoln National asked the Chitkins to consider a voluntary reduction in nursing care in order to prolong Danielle's entitlement to benefits because Lincoln National's expenditures on behalf of Danielle were approaching the lifetime maximum coverage limits set out in the Plan.

In December 1987, Lincoln National announced that it planned to raise medical rates substantially for employees of Jerome's Furniture because Jerome's was "a group where it has been difficult to proactively manage an ongoing claim." The Chitkins argue that the "ongoing claim" was Danielle's claim. Lincoln National does not dispute the Chitkin's interpretation. The Chitkins argue that this rate hike was the first significant step in Lincoln National's effort to terminate the Plan. According to the Chitkins, Lincoln National raised rates in an effort to force most employees out of the Plan. Once Plan membership fell below a certain level, Lincoln National could exercise its right under the Plan to terminate coverage. In December 1988, Lincoln National announced that it would raise rates again in February 1989 to a level almost three times the rate charged during 1987. John Chitkin was the only Jerome's employee who did not leave the Plan after the second rate increase. Lincoln National cancelled the Jerome's Furniture Policy on March 31, 1989.

Following Lincoln National's cancellation of the Plan, the Chitkins were able to obtain coverage through PacifiCare. Lincoln National, however, still retained some obligations toward Danielle under the terms of the Plan because Danielle was completely disabled at the time of the cancellation. Lincoln National's coverage was secondary to PacifiCare's coverage. PacifiCare's coverage of Danielle's physical therapy contained a limit of sixty days of therapy. Danielle soon exhausted these sixty days and turned to Lincoln National for payment for additional treatment under Lincoln National's secondary coverage, because the Jerome's Plan contained no limit on therapy benefits. Despite numerous inquiries by the Chitkins, their attorney, and Danielle's therapy provider, Lincoln National refused to assure the Chitkins or Danielle's therapy provider that it would pay any amount for Danielle's therapy.

On August 15, 1988, the Chitkins filed suit in San Diego Superior Court against a number of defendants, including Le Chateau Homeowners Association and the designer and builder of the Chitkins' subdivision, W. Wolf Industries, Inc.

On January 24, 1990, the Chitkins' counsel sent Lincoln National's counsel, Vicki Lai, a letter asking Lai to make someone available to participate in a mediation between the Chitkins and various tortfeasors. The mediation, however, did not take place as scheduled.

The Chitkins settled their disputes with W. Wolf Industries, Inc., Le Chateau Homeowners, Inc., A & P Management Company, Aquatic Life Services, and Martineau Landscaping in the spring of 1990 for $3,156,967.20, bringing their total recovery from all tortfeasors to $3,256,967.20. The Chitkins dismissed all but their strict liability cause of action against one of the tortfeasors, W. Wolf Industries, before settling.

The Chitkins' settlement agreement with W. Wolf Industries states that "settlement has been effected on the basis of exposure as a result of the strict liability cause of action." The Wolf Industries settlement makes up $1,950,000 of the Chitkins' total recovery from the various tortfeasors.

The Chitkins obtained an order approving a minor's compromise concerning structured

settlements on June 1, 1990. The parties to the settlements filed motions for determination of good faith settlement in June and July 1990. The Chitkins and the various defendants signed settlement agreements in June and July 1990.

Each of the Chitkins' settlement agreements, with the exception of that with Ed and Judy Way, apportions 8% of the damages to John and Nancy Chitkin and for their future wrongful death claims. The agreements also apportion 25% of Danielle's recovery to special damages (including both medical expenses and loss of income) and 75% to general damages.

On March 15, 1990, Lincoln National filed a notice of lien in Superior Court in the amount of $712,000 in an effort to assert reimbursement rights over a portion of the damages the Chitkins appeared likely to recover in their tort suits against various tortfeasors. The Chitkins' counsel argued, apparently successfully, to the various tortfeasor defendants that Lincoln National's lien was invalid and could be ignored. Even after Lincoln National's counsel contacted each of the defendants and asked them to place Lincoln National's name on the settlement drafts, none of the defendants appears to have given much consideration to Lincoln National's position.

The Chitkins filed suit against Lincoln National in state court on August 16, 1990. The Chitkins' complaint listed a number of causes of action including actions for bad faith, breach of the covenant of good faith and fair dealing, and for a declaration that the reimbursement provision in the Plan was invalid. On September 19, 1990, Lincoln National filed a notice of removal in this court, alleging diversity of citizenship and the existence of a federal question, namely whether ERISA preempted any or all of the Chitkins' causes of action.

Lincoln National filed an answer and counterclaim on September 26, 1990. In its counterclaim, Lincoln National alleges that it is entitled to enforce the reimbursement provision in the Plan. Lincoln National prays for $740,456.13, the amount Lincoln National claimed, at one time, to have paid the Chitkins in Plan benefits. The Chitkins filed an answer to Lincoln National's counterclaim on October 17, 1990. The Chitkins' answer includes fourteen affirmative defenses, including unclean hands and unjust enrichment.

On November 15, 1991, this Court issued a seventeen-page order regarding the Chitkins' and Lincoln National's motions for summary judgment. This Court granted Lincoln National's motion for summary judgment on the Chitkin's complaint, finding the Chitkins' state law causes of action were preempted by ERISA. This Court also granted the Chitkins' motion for summary judgment on Lincoln National's counterclaim and denied Lincoln National's cross motion for summary judgment on its counterclaim. This Court held that Lincoln National was not entitled to reimbursement under either a contract-based or unjust enrichment theory because it never required the Chitkins to execute the written repayment agreement called for by the Plan. On March 9, 1992, this Court denied the Chitkins' motion for attorney fees and granted Lincoln National's motion for entry of final judgment on its counterclaim.

Lincoln National filed a notice of appeal on March 26, 1992. On November 24, 1993, the Ninth Circuit reversed this Court in a Memorandum disposition with one judge dissenting. *See* Appendix (quoting the text of the Memorandum). In its Memorandum, the Ninth Circuit held that Lincoln National had standing to seek reimbursement as a Plan fiduciary even though it had ceased to serve as insurer for the Plan. In addition, the Ninth Circuit noted that "the appeal centered around an extremely poorly-drafted provision of the Plan's contract with Lincoln National," but nevertheless construed that provision to favor the insurance company. According to the Ninth Circuit, the clause in the reimbursement provision stating that the insured must agree in writing to reimburse Lincoln National was merely a condition precedent to Lincoln National's obligation to advance funds to cover medical expenses. The Ninth Circuit then held that Lincoln National was entitled to waive the condition precedent. As a result, the Ninth Circuit found, Lincoln National's failure to require the Chitkins to sign a written reimbursement agreement did not affect Lincoln National's

rights to reimbursement. According to the Ninth Circuit, the Chitkins could not use "the murky contract language" to their advantage, and they had no right "to a windfall in the form of a double reimbursement, once from Lincoln National and again from the third party tortfeasors."

The Ninth Circuit's November 24, 1993 Memorandum concludes with the following line: "The judgment of the district court is REVERSED and the case REMANDED for entry of judgment in favor of Lincoln National."

In December 1993, the Chitkins filed a petition for rehearing with suggestion for rehearing *en banc.* In their petition, the Chitkins argued, *inter alia,* that no court had ever ruled on their affirmative defenses and that numerous issues of fact lingered. The Ninth Circuit ordered Lincoln National to respond to the Chitkins' petition for rehearing on January 5, 1994. Lincoln National filed its answer to the Chitkins' petition on January 20, 1994.

On March 9, 1994, the Ninth Circuit issued a two-sentence Order Amending Memorandum that states:

The memorandum disposition filed on November 24, 1993 is amended:

The last paragraph is deleted and replaced with: "The district court's grant of summary judgment in favor of the Chitkins (sic) is reversed. The case is remanded to the district court for further proceedings consistent with this memorandum disposition."

Lincoln National filed its motion for summary judgment the same day this Court issued its mandate hearing notice, April 18, 1994.

This Court has continued this matter a number of times to allow further briefing. The parties have submitted three rounds of briefs: The second and third rounds of briefs address specific questions posed by this Court.

## II. Discussion

### A. Summary Judgment Standard

Fed.R.Civ.P. 56(c) provides that summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." One of the principal purposes of the rule is to dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, the Court must examine all the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). A moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material facts exists. Fed.R.Civ.P. 56(c); *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553–54. If the moving party does not bear the burden of proof at trial, he may discharge his burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex,* 477 at 325, 106 S.Ct. at 2554. The moving party is not required to produce evidence showing the absence of genuine issue of material fact on such issues, nor must the moving party support its motion with evidence negating the nonmoving party's claim. *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 885, 110 S.Ct. 3177, 3185, 111 L.Ed.2d 695 (1990); *United Steelworkers v. Phelps Dodge Corp.,* 865 F.2d 1539, 1542 (9th Cir.), *cert. denied,* 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989). Instead, "the motion may, and should, be granted so long as whatever is before the District Court demonstrates that the standard for the entry of judgment, as set forth in Rule 56(c), is satisfied." *Lujan,* 497 U.S. at 885, 110 S.Ct. at 3187 (quoting *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553).

Once the moving party meets the requirement of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who

"must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511.

■ To make such the required showing, the nonmoving party must go beyond the pleadings to designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553–54. Such evidence need not be in a form admissible at trial to avoid summary judgment. *Id.* The moving party is entitled to judgment as a matter of law if the nonmovant fails to make a sufficient showing of an element of its case with respect to which it has the burden of proof. *Id.*

### B. Law of the Case

■ Under the law of the case doctrine, an appellate court's determination of a legal issue "must be followed in all subsequent proceedings in the same case." *Waggoner v. Dallaire,* 767 F.2d 589, 593 (9th Cir.1985) (internal quotation marks omitted), *cert. denied,* 475 U.S. 1064, 106 S.Ct. 1374, 89 L.Ed.2d 601 (1986). The *Waggoner* court adds:

> The law of the case controls unless the first decision is clearly erroneous and would result in manifest injustice, there has been an intervening change in the law, or the evidence on remand is substantially different.

*Id.* The law of the case extends beyond the explicit decisions of the appellate court to issues decided by necessary implication. *Eichman v. Fotomat Corp.,* 880 F.2d 149, 157 (9th Cir.1989) (internal quotation marks omitted). The trial court is not bound by issues not actually considered by the appellate court. *Exxon Corp. v. United States,* 931 F.2d 874, 877 (Fed.Cir.1991).

When this Court issued its November 15, 1991 Order regarding the cross motions for summary judgment, it granted the Chitkins' motion for summary judgment on Lincoln National's counterclaim and denied Lincoln National's cross motion. This Court found that although Lincoln National asserted five different causes of action in its counterclaim, only two appeared viable: a contract claim and an unjust enrichment claim.

As for the contract claim, this Court interpreted the contract to require Lincoln National to obtain a written agreement for reimbursement before it could perfect its right to reimbursement. Since Lincoln National did not obtain such a written agreement, this Court held that Lincoln National could not recover under what this Court described as a poorly worded contractual reimbursement provision.

This Court also rejected Lincoln National's unjust enrichment cause of action. Lincoln National argued that allowing the Chitkins to keep the amounts they recovered in tort for medical expenses (expenses that Lincoln National already had paid) would amount to a windfall for the Chitkins. This Court rejected Lincoln National's argument after comparing Lincoln National's cause of action with a cause of action asserted by an insurance company in a 1990 Fourth Circuit case, *Provident Life & Accident Ins. Co. v. Waller,* 906 F.2d 985 (4th Cir.1990), *cert. denied,* 498 U.S. 982, 111 S.Ct. 512, 112 L.Ed.2d 524 (1990). Although this Court followed *Waller* in holding that ERISA allows an unjust enrichment cause of action, this Court proceeded to distinguish *Waller* and found that Lincoln National could not recover under an unjust enrichment theory. In this case, unlike *Waller,* any reimbursement could not possibly benefit the Plan because the insurance company had already stopped doing business with the Plan. In addition, this Court found that Lincoln National had not shown one of the elements of a classic unjust enrichment cause of action, i.e. that the Chitkins must reasonably have expected to pay. In fact, one of the trustees of the plan acknowledged that even *she* was unaware of the reimbursement provision until after Danielle Chitkin's injury. Finally, this Court

found that allowing any recovery on an unjust enrichment theory would subvert the contract because Lincoln National had not obtained a written agreement for reimbursement.

The Ninth Circuit reversed this Court. The Ninth Circuit's brief Memorandum disposition, including its later-added one-sentence Order Amending Memorandum, leaves many questions unresolved. This Court begins its analysis of the Ninth Circuit's orders by noting the issues on which the Ninth Circuit has issued definitive rulings:

—This case concerns the interpretation of an ERISA plan.[3]

—Lincoln National has standing to bring an action for restitution under 29 U.S.C. § 1132(a)(3).

—The reimbursement provision was designed to benefit Lincoln National and Lincoln National may seek reimbursement even if it waived its right to a written agreement by the Chitkins to repay sums advanced for medical expenses.[4]

—Allowing the Chitkins to retain the amounts they recovered from the tortfeasors for medical expenses would amount to a windfall in the form of a double reimbursement to the Chitkins.

The parties have devoted substantial portions of the first two rounds of briefs to their discussions of other conclusions that can be drawn from the Ninth Circuit's orders. In fact, both sides have read a considerable amount into the Ninth Circuit's decision to issue the Order Amending Memorandum. Both sides appear to be willing to accept the following limited interpretation of the Ninth Circuit's actions: When the Chitkins argued in their motion for rehearing that this Court never considered the validity of the Chitkins' affirmative defenses to Lincoln National's counterclaim, the Ninth Circuit decided to remand the case for a hearing on those defenses. Although this Court can only speculate, it appears that the Ninth Circuit was persuaded to change the last line of its opinion because of its prior holding in *Abend v. MCA, Inc.*, 863 F.2d 1465 (9th Cir.1988), *aff'd sub nom. Stewart v. Abend,* 495 U.S. 207, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990). In *Abend,* the Ninth Circuit noted that outstanding affirmative defenses prevented it from ordering the district court to enter judgment for the side against whom the affirmative defenses had been raised.

The Chitkins offer an alternative, bolder approach to the Ninth Circuit's amending order. According to the Chitkins, the Ninth Circuit's amending order leaves the necessary implication that at least one of the Chitkins' affirmative defenses is not invalid as a matter of law. The Chitkins explain that if the Ninth Circuit thought all of the Chitkins' affirmative defenses were invalid under ERISA, the Ninth Circuit would not have remanded the case for further proceedings.

Lincoln National also takes an aggressive stand on the Ninth Circuit's decision to amend its memorandum opinion. Lincoln National points out that the parties fully briefed the affirmative defenses in this Court before this Court issued its Order granting the Chitkins' summary judgment motion. In light of this fact, Lincoln National argues

---

**3.** The Chitkins still argue that this case involves the interpretation of an insurance contract with an ERISA plan, not the interpretation of an ERISA plan. Since the reimbursement agreement appears in the Plan, however, the Ninth Circuit's position enjoys substantial factual support.

**4.** Less than one year after the Ninth Circuit issued its Memorandum decision, it adopted in an unrelated case "the doctrine of reasonable expectations [of the insured] as a principle of the uniform federal common law informing interpretation of ERISA-governed insurance contracts." *Saltarelli v. Bob Baker Group Medical Trust,* 35 F.3d 382, 387 (9th Cir.1994). If *Saltarelli* had constituted an intervening change in the law, this Court might have been tempted to revisit the Ninth Circuit's construction of the reimbursement clause. The Ninth Circuit, however, indicated two years before it issued its Memorandum disposition that all ambiguities in an ERISA contract must be construed in favor of the insured. *Kunin v. Benefit Trust Life Ins. Co.,* 910 F.2d 534, 539 (9th Cir.), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990). Since the law appears not to have changed markedly between *Kunin* and now, the law of the case would not permit this Court to reject the Ninth Circuit's interpretation of the reimbursement clause unless it found that the Ninth Circuit's interpretation was clearly erroneous. This Court is not prepared to make such a finding at this time.

that if any of the Chitkins' affirmative defenses were valid as a matter of law, the Ninth Circuit would have had to uphold this Court's decision. Lincoln National argues that the amending order was meant merely to allow this Court to consider the Chitkins' twelfth affirmative defense which states that Lincoln National may not seek reimbursement for amounts that the Chitkins recovered through a strict liability settlement or that were allocated to damages other than medical expenses.

Lincoln National argues in the alternative that the Ninth Circuit realized after its first opinion that it had instructed this Court to grant summary judgment to Lincoln National even though Lincoln National did not (because it could not) appeal this Court's Order denying its motion for summary judgment. As a result, Lincoln National's most aggressive argument goes, the Ninth Circuit did not care about any remaining substantive issues when it issued its Order Amending Memorandum. Instead, Lincoln National contends, the Ninth Circuit merely wanted to correct its procedural misstep.

Although this Court, like the parties, can only guess at the reasons behind the Ninth Circuit's decision to amend its Memorandum, this Court concludes that the Ninth Circuit intended to allow this Court to consider the Chitkins' affirmative defenses. If the Ninth Circuit implied anything about the validity of the affirmative defenses, it appears to have been nothing more than that at least one of the Chitkins' affirmative defenses was not invalid as a matter of law. As a result, this Court must consider as part of its decision today whether any of the Chitkins' affirmative defenses defeats or undermines Lincoln National's reimbursement right.

### C. Lincoln National's Unjust Enrichment Cause of Action

■ This Court's analysis of Lincoln National's reimbursement right begins, as it must begin, with 29 U.S.C. § 1132(a)(3) and the Supreme Court's decision in *Mertens v. Hewitt Assoc.*, —— U.S. ——, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993).

The Ninth Circuit held in its Memorandum decision that Lincoln National has standing to bring an action for restitution under section 1132(a)(3). Section 1132(a)(3) states:

A civil action may be brought ... by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

In the case at hand, Lincoln National may seek "other appropriate equitable relief ... to enforce the ... terms of the plan," namely the reimbursement provision.

The Supreme Court's decision in *Mertens* addresses the meaning of the phrase "other appropriate equitable relief." According to the Supreme Court, the phrase means "categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)." *Mertens,* —— U.S. at ——, 113 S.Ct. at 2069 (emphasis and parentheses in original). In *Mertens,* the Supreme Court held that the plaintiffs, a class of former employees, could not state a claim for breach of fiduciary duties against an actuary. The actuary provided services to the plan but was not considered a plan "fiduciary." The plaintiffs characterized their suit as one for equitable relief under § 1132(a)(3), but the Court found that the plaintiffs were seeking monetary damages, not traditional equitable relief such as an injunction or restitution. *Id.* at ——, ——, 113 S.Ct. at 2065, 2068. The Court held that the plaintiffs could not bring a cause of action against the actuary outside of ERISA's six civil enforcement provisions, and ruled that the plaintiffs' purported § 1132(a)(3) action did not state a claim for equitable relief. *Id.* at —— – ——, 113 S.Ct. at 2066–68.

Following *Mertens,* the Ninth Circuit reconsidered its approach to ERISA cases in *Watkins v. Westinghouse Hanford Co.,* 12 F.3d 1517 (9th Cir.1993). In *Watkins,* the Ninth Circuit rejected the Watkinses' cause of action based on equitable estoppel because that cause of action did not fall within one of ERISA's six civil enforcement provisions.

*Id.* at 1528. The Watkinses claimed that Mr. Watkins's employer was estopped from altering its original calculation of Mr. Watkins's retirement benefits, even though its initial calculation had been in error. *Id.* at 1522. The court considered whether any of the Watkinses' claims were viable under any of ERISA's six civil enforcement provisions. The court specifically rejected the district court's conclusion that the Watkinses could bring their equitable estoppel claim under § 1132(a)(3). *Id.* at 1528. The Ninth Circuit found that the Watkinses' claim was essentially one for damages which was barred by the Supreme Court's holding in *Mertens. Id.* at 1527–28 & n. 5.

In *Watkins* the Ninth Circuit appears to have acknowledged that many of its prior opinions dealing with ERISA might have been off base. Specifically, the *Watkins* court suggested that the Ninth Circuit might have taken too many liberties in expanding the scope of ERISA through decisions applying federal common law, especially common law relating to equitable estoppel. *Id.* at 1527. One of the decisions the *Watkins* court questioned because of the case's reliance on equitable estoppel is *Ellenburg v. Brockway, Inc.,* 763 F.2d 1091 (9th Cir.1985).

In *Ellenburg* the Ninth Circuit started from the premise that actions based on equitable estoppel were permissible under or despite ERISA, but found that the plaintiff had failed to demonstrate that he was entitled to such relief. *Id.* at 1096. After *Mertens* and *Watkins,* it appears that any part of *Ellenburg* that suggests that causes of action based on equitable estoppel can be brought outside the context of one of ERISA's six civil enforcement provisions is no longer good law. *Mertens,* —— U.S. at ——–——, 113 S.Ct. at 2066–68; *Watkins,* 12 F.3d at 1528.

Despite the Ninth Circuit's efforts in *Watkins* to circumscribe the availability of equitable causes of action, equitable causes of action still are available when brought pursuant to § 1132(a)(3). In fact, in a recent decision, the Ninth Circuit suggested in dicta that an insurer may bring an equitable action under § 1132(a) to enforce a reimbursement provision in an ERISA plan. *Pacificare, Inc. v. Martin,* 34 F.3d 834, 837 (9th Cir.1994).[5] The district court held in the plaintiff's favor, finding that the plaintiff could bring an action under the federal common law of ERISA for unjust enrichment. *Id.* at 836. The Ninth Circuit reversed on the grounds that Pacificare did not state a cause of action under § 1132(a)(3) because the complaint invoked *Waller* and its discussion of federal common law causes of action rather than § 1132(a)(3). *Id.* at 836, 838.[6] The court, however, left open the possibility that Pacificare could amend its complaint to state a claim "under § 1132(a) seeking equitable relief to enforce the terms of the plan." *Id.* at 838.

In the case at hand, the Ninth Circuit already has held that Lincoln National has standing to bring an action seeking restitution under § 1132(a)(3). Although the court did not expressly go beyond its holding that Lincoln National had standing to bring such a cause of action, language in the Memorandum suggests that Lincoln National's unjust enrichment cause of action has merit. The Ninth Circuit found that the Chitkins would receive a "windfall" in the form of a "double reimbursement" if they were not required to repay Lincoln National for the medical benefits it had extended to them. In fact, the Ninth Circuit found no "plausible justification" for allowing the Chitkins to defeat Lincoln National's reimbursement right. In light of this language in the Memorandum, and the dicta in *Pacificare,* this Court finds

---

**5.** The *Pacificare* panel comprised the same three Ninth Circuit judges that reversed this Court in the case at hand. The Memorandum disposition in this case includes no indication of which Judge wrote the majority opinion. Judges Norris and Wiggins, however, were in the majority. Judge O'Scannlain vigorously dissented. In *Pacificare,* Judge O'Scannlain authored the majority opinion, Judge Wiggins joined Judge O'Scannlain in the majority, and Judge Norris dissented.

**6.** Judge Norris argued in dissent that the court should have construed the complaint to state a cause of action for unjust enrichment under § 1132(a)(3). According to Judge Norris, the plaintiff's reliance on *Waller* was irrelevant because the plaintiff was not required to cite any authority in its complaint. *Pacificare,* 34 F.3d at 838 (Norris, J. dissenting).

that Lincoln National properly may seek restitution in an effort to enforce the terms of the Plan (which expressly provides for reimbursement) and to prevent the unjust enrichment of the Chitkins. This Court discusses Lincoln National's rights to reimbursement under the Plan more fully below. *See infra* part II.D.5.

### D. Affirmative Defenses

■ Although the Ninth Circuit's discussion of equitable estoppel in *Ellenburg* has been undermined by its decision in *Watkins,* *Ellenburg* does not appear to have been completely invalidated by subsequent Ninth Circuit and Supreme Court decisions. For example, the reasoning behind *Ellenburg*'s discussion of equitable defenses to equitable claims under ERISA still appears to be valid.

The *Ellenburg* court ruled that even if the plaintiff could have stated a claim under principles of equitable estoppel, plaintiff's claim would have been barred by the plaintiff's unclean hands. 763 F.2d at 1097. Ellenburg submitted a false birth certificate in order to increase the amount of retirement benefits he could obtain. This, the court found, dirtied his hands and prevented him from seeking relief under the doctrine of equitable estoppel. *Id.* The Ninth Circuit's finding that the doctrine of unclean hands barred the plaintiff's equitable cause of action did not depend on the validity of that equitable cause of action. Instead, the Ninth Circuit appears to have found simply that equitable defenses are appropriate under ERISA whenever a defendant faces equitable claims.

Other federal courts have recognized or assumed the validity of equitable defenses to equitable claims under ERISA. *E.g., In re HECI Exploration Co., Inc.,* 862 F.2d 513, 523 & n. 18 (5th Cir.1988) (considering equitable defense of waiver to plan member's action under ERISA to recover benefits); *Holt v. Winpisinger,* 811 F.2d 1532, 1541–42 (D.C.Cir.1987) (considering, but rejecting, plan administrators' equitable defenses); *Donovan v. Robbins,* 99 F.R.D. 593 (N.D.Ill. 1983). In *Donovan,* the court refused to "banish[ ] to the hinterlands the traditional equitable analysis" simply because Congress

determined in ERISA that equitable relief should be available. *Id.* at 598–99.

This Court finds that simple logic and principles of due process of law support the proposition that litigants must be able to raise equitable defenses to equitable causes of action. *Mertens'* crackdown on the creation of new causes of action through the expansion of federal common law does not affect the validity of equitable defenses. No new suits will be permitted just because equitable defenses are allowed. Instead, parties seeking equitable relief will simply have to show that the equities are in their favor.

#### 1. Prior material breach

■ The Chitkins raise the defense of prior material breach in their answer to Lincoln National's counterclaim. The doctrine, however, does not apply here because Lincoln National must seek equitable, not contractual, relief under ERISA. This Court will consider the Chitkins' allegations about Lincoln National's refusal to pay certain benefits in connection with the Chitkins' unclean hands defense.

#### 2. Unclean hands

In the case at hand, the Chitkins argue that Lincoln National's efforts to secure an improper lien on the Chitkins' settlements with various tortfeasors, among other misconduct, demonstrates Lincoln National's dirtying of its hands in connection with its efforts to seek reimbursement.

The Chitkins base their unclean hands affirmative defense on *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). The case includes sweeping language about the applicability of the unclean hands doctrine:

> The guiding doctrine in this case is the equitable maxim that "he who comes into equity must come with clean hands." This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is

rooted in the historical concept of a court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith.

*Id.* at 814, 65 S.Ct. at 997.

■ The doctrine of unclean hands applies only when the plaintiff's allegedly unclean conduct was willful or fraudulent. Mere negligence is not sufficient. *Id.* at 815, 65 S.Ct. at 997–98; *Eresch v. Braecklein,* 133 F.2d 12, 14 (10th Cir.1943); 27 *Am.Jur.2d Equity* § 138 at 674 (2d ed. 1966).

Courts typically do not apply the doctrine of unclean hands where the defendant has suffered no harm as a result of the plaintiff's actions. 27 *Am.Jur.2d Equity* § 144 at 681 ("[I]t has been held that the maxim should not be applied where the defendant has not been seriously harmed and the wrong complained of can be corrected."); 2 Spencer W. Symons, *Pomeroy's Equity Jurisprudence* § 399 at 99 (5th ed. 1941) [hereinafter *Pomeroy's Equity Jurisprudence* ] (defendant must show that he has been injured by plaintiff's improper conduct before court will apply doctrine).

■ In addition, the doctrine applies only when the plaintiff's fraudulent or deceitful conduct relates to the controversy in issue. *Ellenburg v. Brockway, Inc.,* 763 F.2d 1091, 1097 (9th Cir.1985). According to the *Ellenburg* court, "In applying the doctrine [of unclean hands], '[w]hat is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendants.'" *Id.* at 1097 (quoting *Republic Molding Corp. v. B.W. Photo Utils.,* 319 F.2d 347, 349 (9th Cir.1963)).

Other courts and commentators have imposed different requirements concerning the closeness of the connection between the unclean acts and the right asserted. *Compare Christensen v. Felton,* 322 F.2d 323, 327 (9th Cir.1963) (plaintiff cannot rely on his own wrongful act to make a recovery) *with Precision Instrument,* 324 U.S. at 814, 65 S.Ct. at 997 (plaintiff not entitled to equitable relief where he is "tainted with inequitableness or bad faith relative to the matter in which he seeks relief"); 27 *Am.Jur.2d Equity* § 142 at 679 (unclean hands doctrine applies when wrongful conduct is "connected with, or related to, the dispute between the complainant and the defendant"); *and Pomeroy's Equity Jurisprudence* § 399 at 95 (plaintiff's conduct must have "affected the equitable relations subsisting between the two parties").

Not surprisingly, Lincoln National relies on those cases requiring a close connection between the plaintiff's conduct and the right sued upon. In fact, Lincoln National bases the bulk of its analysis on a principle articulated in *Am.Jur.2d:* "[I]f the complainant's equity is shown to have been founded upon conduct which was not inequitable, relief will not be denied because of acts which the complainant subsequently did in furtherance of the claim." 27 *Am.Jur.2d Equity* § 143 at 681. According to Lincoln National, the doctrine of unclean hands does not apply in the case at hand because the Chitkins have not even alleged that Lincoln National acted improperly when it created the right on which it seeks relief—the reimbursement clause in the Plan. Lincoln National points out that all of the Chitkins allegations center on Lincoln National's actions in connection with *enforcement* of its reimbursement right and allegedly unclean acts related to reimbursement.

■ Lincoln National also argues at length that this Court cannot consider the doctrine of unclean hands because Lincoln National is asserting a contract-based right. In support of this argument Lincoln National cites *Manufacturers' Finance Co. v. McKey,* 294 U.S. 442, 447–48, 55 S.Ct. 444, 446–47, 79 L.Ed. 982 (1935).

*Manufacturers' Finance Co.* involved a contract for the sale of accounts receivable. *Id.* at 443–44, 55 S.Ct. at 445. Under the terms of the contract, Manufacturers' Finance advanced a sum of money to the Grigsby–Grunow Company essentially in exchange for its accounts receivable. *Id.* at 444, 55 S.Ct. at 445. When a creditor brought suit against Grigsby–Grunow in federal district court, that court appointed receivers for the company. *Id.* Manufacturers' Finance's interests were adversely affected by the appointment of receivers. As a result, Manu-

facturers' Finance intervened in the receivership action "with a petition seeking compliance on the part of the receivers with the terms of its contract." *Id.* at 445, 55 S.Ct. at 446.

The district court fashioned a decree under its powers in equity that did not give Manufacturers' Finance the damages to which it would have been entitled under the contract. *Id.* at 446, 55 S.Ct. at 446. The court of appeals affirmed. *Id.* The Supreme Court reversed, finding that the district court had erred by applying equitable principles, such as the doctrine of unclean hands, in a legal action. *Id.* at 448–49, 55 S.Ct. at 447. Although the Supreme Court found that Manufacturers' Finance brought its petition in a court of equity, it noted that the "petitioner here did not seek equitable relief." *Id.* at 449, 55 S.Ct. at 447. The Court added, "It seems plain enough that in no aspect of the case is any equitable principle involved." *Id.* at 451, 55 S.Ct. at 448.

Lincoln National also cites 11 B.E. Witkin, *Summary of California Law Equity* § 3 (9th ed. 1990) in support of its argument that equitable defenses should not apply to its contract-based equitable claim. That section, however, merely states that "there is no right to equitable relief or an equitable remedy when there is an *adequate remedy at law.*" *Id.* (emphasis in original). In the case at hand, Lincoln National· may assert its reimbursement right only through an equitable action. *Mertens v. Hewitt Assoc.,* —— U.S. ——, —— – ——, 113 S.Ct. 2063, 2068–69, 124 L.Ed.2d 161 (1993). Lincoln National has no adequate remedy at law. Its action, unlike that in *Manufacturers' Finance,* plainly involves equitable principles. Therefore, Lincoln National's reliance on *Manufacturers' Finance* does not help it convince this Court that it should have the right to assert an equitable claim but not be subject to traditional equitable defenses.

The Chitkins argue that Lincoln National dirtied its hands in a number of different ways. For example, the Chitkins argue that Lincoln National filed an improper lien, refused to pay therapy benefits, drastically raised rates for Plan members in an effort to cancel its insurance contract with the Plan,

and repeatedly worked to reduce Danielle Chitkin's nursing care.

### a. *Lincoln National's $712,000 lien*

■ According to the Chitkins, Lincoln National dirtied its hands by filing a notice of lien in state court in the amount of $712,000. The Chitkins argue that Lincoln National knew at the time it filed this lien that Lincoln National's right to reimbursement, if any, would be less than $712,000. According to the Chitkins, the Plan required Lincoln National to deduct some portion of the amount it could seek in reimbursement from an insured individual to account for the attorneys fees and costs the insured expended in obtaining a settlement. Since Lincoln National knew about the required deduction for attorneys fees, the Chitkins argue, Lincoln National acted improperly when it sought a lien for the full amount of benefits it paid on Danielle Chitkins' behalf. The Chitkins allege that Lincoln National's lien delayed final settlements in their tort cases, causing the Chitkins to lose interest they otherwise would have received on settlement funds. The Chitkins' counsel explains that after great effort on his part he finally succeeded in convincing the various tortfeasors to ignore the lien. According to the Chitkins, Lincoln National ultimately abandoned its lien.

The Chitkins also contend that the mere act of filing a lien in state court, regardless of the amount, soiled Lincoln National's hands. The Chitkins point out that federal courts have exclusive jurisdiction over civil actions brought under 29 U.S.C. § 1132(a)(3). 29 U.S.C. § 1132(e). As a result, the Chitkins contend, Lincoln National had to have known it improperly was invoking state court jurisdiction to obtain an unfair advantage when it filed its notice of lien.

Lincoln National counters that it filed its lien only after the Chitkins' counsel announced that the Chitkins would not cooperate with Lincoln National regarding Lincoln National's efforts to seek reimbursement. Lincoln National argues that it was forced to seek the full $712,000 because the Chitkins' counsel would not give Lincoln National information concerning the Chitkins' attorneys

fees and costs. Lincoln National stresses that it never abandoned its lien.

Although Lincoln National filed a lien for an amount in excess of what it properly could recover, this Court finds that its filing of the lien did not rise to the level of unclean hands. Lincoln National cannot bear the blame for the Chitkins' counsel's refusal to provide Lincoln National with crucial information about costs and attorney fees. In addition, this Court questions whether the amount of the lien caused any injury to the Chitkins that would not have resulted from a lien in the proper amount: A lien for a reduced amount almost certainly would have delayed settlement negotiations in the same way the $712,-000 lien did.

■ Furthermore, this Court finds that Lincoln National did not fraudulently or willfully invoke the jurisdiction of the wrong court when it filed its notice of lien. Only after *Mertens* and *Pacificare* has it become clear that Lincoln National may assert its right to reimbursement only through an equitable action brought under § 1132(a)(3). At the time Lincoln National filed its lien, any number of possible avenues of recovery could have appeared available to reasonable attorneys and insurance companies. In short, Lincoln National's conduct did not sufficiently dirty its hands to deny it the right to assert its reimbursement right by filing a notice of lien in state court.

### b. *Lincoln National's refusal to pay therapy benefits*

■ The Chitkins next contend that Lincoln National dirtied its hands when it refused to pay for Danielle Chitkin's physical and occupational therapy after Danielle used up her Pacificare therapy benefits. The Chitkins originally pointed to this conduct as part of a separate affirmative defense, prior material breach.

The Chitkins' unclean hands defense based on Lincoln National's conduct in connection with therapy benefits fails for two reasons. First, Lincoln National's refusal to pay therapy benefits has nothing to do with its right to seek reimbursement under the plan. According to the Memorandum disposition, Lin-

coln National held a right to future reimbursement when it paid for Danielle's medical care. Lincoln National's right to reimbursement matured when the Chitkins settled their tort cases with the various tortfeasors. Actions Lincoln National took other than those related to the creation and enforcement of this reimbursement right fall outside the scope of the doctrine of unclean hands. *See Ellenburg*, 763 F.2d at 1097; 27 *Am.Jur.2d Equity* § 143 at 681. Second, the Chitkins' affirmative defense based on Lincoln National's failure to pay therapy benefits would be more appropriately characterized as a *cause of action* under ERISA for failure to pay benefits. If this Court barred Lincoln National's unjust enrichment cause of action because of its unclean conduct in connection with payment of therapy benefits, it would grant the Chitkins a windfall. Under ERISA, the Chitkins may recover at most the value of the unpaid benefits, roughly $20,000. Under the Chitkins' analysis, the Chitkins could block Lincoln National's reimbursement right worth roughly $500,000. In effect, the Chitkins would recover the value of the unpaid benefits, plus some bonus amount due to Lincoln National's alleged bad faith conduct even though ERISA does not permit bad faith actions against ERISA-plan insurance companies. *See* 29 U.S.C. § 1132(a)(1)(B); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45, 107 S.Ct. 1549, 1551–52, 95 L.Ed.2d 39 (1987) (ERISA preempts all state common law causes of action, including those under which a participant could seek punitive or general damages).

### c. *Lincoln National's decision to raise rates*

■ The Chitkins point to a third example of Lincoln National's unclean hands. The Chitkins contend that Lincoln National engaged in willful or tortious misconduct when it drastically raised the rates it charged Plan participants. Over the course of two years, Lincoln National nearly tripled the rates it charged Plan members. The Chitkins allege that Lincoln National increased the rates in an effort to force plan participation down to a level that would allow Lincoln National to cancel its contract with the Plan. In so doing, the Chitkins argue, Lincoln National terminated Danielle's coverage before she ex-

hausted her $1,000,000 lifetime limit of coverage, saving Lincoln National roughly $300,000.

Once again, the Chitkins' allegations in support of their affirmative defense sound more like a cause of action for denial of benefits than an affirmative defense to Lincoln National's reimbursement right. Even if Lincoln National deprived the Chitkins of their implied right to lifetime coverage when it terminated the Plan, Lincoln National's decision to terminate was at most tangentially related to its creation and enforcement of its reimbursement right.

### d. Lincoln National's efforts to reduce nursing care

■ Finally, the Chitkins argue that Lincoln National dirtied its hands when it repeatedly endeavored to reduce Danielle Chitkin's nursing care. According to the Chitkins, Lincoln National first misled Danielle's doctor about John Chitkin's and Nancy Chitkin's positions on full-time nursing care in an effort to reduce the number of hours of care. The Chitkins add that Lincoln National also began to challenge doctors' characterization of Danielle's care as noncustodial in an effort to reduce Danielle's nursing care. Once again, however, Lincoln National's allegedly unclean conduct was collateral to its efforts to assert its reimbursement right.

### 3. Waiver, election of remedies, estoppel and res judicata

■ The Chitkins raise a number of additional affirmative defenses based on Lincoln National's filing of its notice of lien. In these defenses, the Chitkins argue that Lincoln National either should have pursued its lien in state court or that it never should have filed the lien in state court if it knew that this Court had exclusive jurisdiction over Lincoln National's claim.

As noted above, however, this Court will not exercise its equitable discretion to deny Lincoln National's right to reimbursement because of the lien. After *Mertens*, it is clear that Lincoln National may assert its reimbursement right only under § 1132(a)(3), a section subject to exclusive federal jurisdiction. At the time Lincoln National filed its lien, however, the law was much less certain. The Chitkins have not pointed to any evidence suggesting that Lincoln National knew at the time it filed its lien that a state court could not hear its complaint for reimbursement.

In addition, the Chitkins have not shown that they have a valid estoppel or election of remedies defense.[7] They have not demonstrated that they have been prejudiced by Lincoln National's decision to seek a remedy other than by way of its lien.

■ The Chitkins' argument that res judicata bars Lincoln National's counterclaim also is without merit. Lincoln National's right to reimbursement never was adjudicated and the only final judgment between the Chitkins and Lincoln National concerning the counterclaim has been reversed by the Ninth Circuit. Consequently, res judicata does not apply. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 & n. 4, 99 S.Ct. 645, 649 & n. 4, 58 L.Ed.2d 552 (1979) ("Under the doctrine of res judicata, *a judgment on the merits* in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action.").

### 4. Unjust enrichment

■ In their seventh affirmative defense, the Chitkins argue that Lincoln National, not the Chitkins, would be unjustly enriched if this Court granted Lincoln National's motion for summary judgment. According to the Chitkins, Lincoln National recovered at least a substantial portion of its Chitkin-related expenses through huge rate hikes for Jerome's employees before Lincoln National terminated the Plan.

In response, Lincoln National argues that the Ninth Circuit already has rejected the Chitkins' unjust enrichment defense and that the Ninth Circuit's decision on the unjust enrichment issue binds this Court under the law of the case doctrine. According to Lin-

---

**7.** The doctrine of election of remedies has fallen into disfavor. Now courts apply estoppel analyses and consider not only the plaintiff's manifestation of choice, but also the effects of the choice on the defendant. 3 B.E. Witkin, *California Procedure Actions* § 138 at 167–68 (9th ed. 1987).

coln National, the parties briefed the unjust enrichment affirmative defense to the Ninth Circuit, and the Ninth Circuit pointed out that the Chitkins would enjoy a windfall double recovery if they were not required to repay Lincoln National. In addition, Lincoln National argues, the Ninth Circuit would have been compelled to uphold this Court's decision if it found in the Chitkins' favor on their unjust enrichment defense: Had the Chitkins' unjust enrichment defense been valid, Lincoln National argues, the defense would have defeated Lincoln National's right to reimbursement.

The Chitkins maintain that the Ninth Circuit did not necessarily reject their unjust enrichment defense. They suggest, quite plausibly, that the Ninth Circuit did not consider the Chitkins' affirmative defenses until after the Ninth Circuit issued its Memorandum disposition. The Chitkins also argue that the Ninth Circuit would not have had to reject out of hand the Chitkins' unjust enrichment argument to reverse this Court's decision. Instead, according to the Chitkins, the Ninth Circuit could have reversed this Court and remanded to allow this Court to explore the facts surrounding the Chitkins' unjust enrichment defense.

This Court finds that the Chitkins have the better of the argument concerning the law of the case on the unjust enrichment affirmative defense. The Ninth Circuit did not expressly state that it found in Lincoln National's favor on the Chitkins' unjust enrichment affirmative defense. In addition, the Ninth Circuit would not have had to find in Lincoln National's favor on the unjust enrichment affirmative defense to reverse this Court: It only would have had to find that issues of fact still existed concerning the Chitkins' unjust enrichment affirmative defense.

Despite their success on the law of the case issue, the Chitkins still cannot prevail on their unjust enrichment affirmative defense. First, the Chitkins have not met the traditional standard for unjust enrichment. They have not shown that the circumstances that would surround Lincoln National's receipt of repayment would make it unjust for Lincoln National to retain reimbursed funds.

If anything, Lincoln National stands to be *justly* enriched. In order to obtain reimbursement, Lincoln National is seeking equitable relief in an effort to enforce the written terms of an ERISA plan—a goal favored by the statute. *See* § 1132(a)(3). In fact, Lincoln National is attempting to enforce the same reimbursement provision that, among other provisions, allowed Lincoln National to charge Jerome's and its employees roughly 7% less than they otherwise would have had to pay.

The Chitkins' unjust enrichment defense also fails because they have offered speculation, but no firm evidence, regarding the extent to which Lincoln National recouped its expenses through increased premiums. Lincoln National, by contrast, has offered the declaration of its president, William L. Bogardus. In his declaration, Bogardus unequivocally states that Lincoln National received no reimbursement through the Plan or the Plan's pooling mechanism to offset its expenses on behalf of Danielle Chitkin. The Chitkins have not met the burden on them to come forward with evidence showing that material issues of fact exist concerning their unjust enrichment affirmative defense.

### 5. Allocation

In their twelfth affirmative defense and in their oppositions to both of Lincoln National's motions for summary judgment, the Chitkins have argued that Lincoln National is not entitled to full reimbursement. According to the Chitkins, the $1,950,000 they recovered from Wolf Industries is not subject to the Return of Over Payment clause, because the Chitkins recovered from Wolf on a strict liability cause of action. The Chitkins argue that the Return of Over Payment clause permits Lincoln National to seek reimbursement only from amounts insured individuals recover as a result of the negligent or intentional acts of third parties.

In addition, the Chitkins contend in their twelfth affirmative defense that Lincoln National's reimbursement right does not "apply to any recovery for anything other than medical expenses." With the exception of their settlement with Ed and Judy Way, all of the Chitkins' settlements with the various tort-

feasors apportion less than 25% of the settlement amount to medical expenses.

Under the Chitkins' analysis, Lincoln National would be entitled to recover an amount less than $250,000.[8]

Although the Chitkins' argument about the strict liability characterization of the Wolf settlement appears valid, their argument concerning the effects of the allocations between general and specific damages breaks down in the face of the Plan's language and the doctrine of unjust enrichment.

a. *Construction of ERISA plan language*

 Courts interpreting repayment provisions in ERISA plans uniformly have held that the language of a plan's repayment provision establishes the extent of the plan's or insurance company's reimbursement right, even when the plan's or insurance company's cause of action is for unjust enrichment. When the reimbursement provision states that the plan may recover from any amount the insured may receive from a third party, courts have ignored the settling parties' allocation of the settlement and have awarded the plan full reimbursement. *E.g., McIntosh v. Pacific Holding Co.,* 992 F.2d 882, 884 (8th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 441, 126 L.Ed.2d 375 (1993); *Singleton v. Board of Trustees, of IBEW Local 613,* 830 F.Supp. 630, 632 (N.D.Ga.1993); *Cutting v. Jerome Foods, Inc.,* 820 F.Supp. 1146, 1155 (W.D.Wis.1991), *aff'd,* 993 F.2d 1293 (7th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 308, 126 L.Ed.2d 255 (1993); *Dugan v. Nickla,* 763 F.Supp. 981, 984 (N.D.Ill.1991); *cf. U.S. Healthcare, Inc. v. O'Brien,* 868 F.Supp. 607 (S.D.N.Y.1994) (ERISA plan not entitled to reimbursement from settlement in which no funds were allocated to medical expenses when right of recovery clause specifically limited plan's reimbursement right to amounts the insured received from a third party to compensate him for his medical expenses).

The *McIntosh* court held that the terms of the particular plan controlled the resolution of that case. *McIntosh,* 992 F.2d at 884.

The court construed the plan's broad language to permit the plan to assert "entitlement to compensation, either for so-called 'economic damages,' such as medical expenses and loss of earning capacity, or for so-called 'noneconomic damages,' such as physical pain and suffering." *Id.* at 884.

The *Singleton* court granted summary judgment for an ERISA plan when the plan sought to recover its expenses for the insured's medical care from the insured's settlement for pain and suffering. *Singleton,* 830 F.Supp. at 632. The court explained that "when the plan summary and subrogation agreement provide in broad terms, such as *any* recovery *relating to* the injury, that settlement proceeds are to be repaid to the plan, such provisions are to be read to include all compensation received, including 'non-economic damages' such as pain and suffering." *Id.* at 631–32 (emphasis in original). The *Singleton* court explained the rationale behind its ruling: "[F]ailure to repay all amounts received in settlement constitutes a double recovery, and ... Congress intended in ERISA 'to ensure that plan funds are administered equitably, and that no one party, not even plan beneficiaries, should unjustly profit.'" *Id.* (quoting *Provident Life & Accident Ins. Co. v. Waller,* 906 F.2d 985, 993 (4th Cir.), *cert. denied,* 498 U.S. 982, 111 S.Ct. 512, 112 L.Ed.2d 524 (1990)).

In *U.S. Healthcare, Inc. v. O'Brien,* 868 F.Supp. 607, 613–14 (S.D.N.Y.1994), the Southern District of New York analyzed the case before it under an unjust enrichment analysis and found that the language of the plan still controlled. In *U.S. Healthcare,* the ERISA plan contained a reimbursement provision permitting the plan to seek reimbursement only from amounts the insured received from tortfeasors " '(i) for hospital, medical or surgical services; and (ii) only to the extent that those services were provided by [the plan].'" *Id.* at 611 (quoting the right of recovery clause). Nevertheless, U.S. Healthcare attempted to recover payments it advanced to its insured even though the settle-

8. The Chitkins acknowledge that this Court could not determine the exact amount without a fact-based inquiry into an allocation within an allocation: This Court would have to determine what

portion of the specific damages in each settlement was for medical expenses as opposed to loss of income.

ment orders, approved by a state court, allocated none of the settlement between the insured and a tortfeasor to medical expenses. *Id.* at 609–10, 610–11. U.S. Healthcare argued that it should be able to recover the benefits it advanced under an unjust enrichment theory regardless of the language of the plan. *Id.* at 613–14. The Southern District of New York rejected U.S. Healthcare's analysis, because "according to the terms of the contract, USH should reasonably expect to be reimbursed, and the O'Briens should reasonably expect to reimburse USH, 'only when' the O'Briens receive money for 'hospital, medical or surgical services.'" *Id.*

These courts' analyses are consistent with the language of § 1132(a)(3) which allows fiduciaries to seek equitable relief in order to enforce the terms of ERISA plans. The statute itself indicates that the extent of the equitable relief available to the Plan turns on the language of the Plan. § 1132(a)(3)(B)(ii) (certain parties may seek equitable relief "to enforce ... the terms of the plan.").

### b. *Construction of the Return of Over Payment clause*

 In the case at hand, the Return of Over Payment clause in the Plan permits Lincoln National to seek reimbursement "from *any* amount of money received by the insured individual from the third party, or its insurer." (emphasis added). The Return of Over Payment clause continues, "The repayment will be to the extent of the benefits paid by Lincoln National, but will not exceed the amount of the payment received by the individual from the third party, or its insurer." The clause purports to be binding on the insured individual "whether ... the medical or dental charges ... are itemized in the third party payment." The language in the reimbursement provision in the Plan appears to favor the Plan to an even greater extent than plan language in *McIntosh, Singleton,* and *Dugan.* The terms of the Plan do not in any way imply that Lincoln National would be able to recover only from settlement funds allocated to medical expenses.

Language in the Plan limiting the Plan's right of recovery to medical or dental charges resulting from the negligent or intentional act of a third party suggests that

the funds received by the Chitkins by way of their settlement with Wolf on a strict liability theory are not subject to the Return of Over Payment clause. Although the Plan does not expressly rule out the possibility that strict liability settlements are subject to the reimbursement provision, this Court will construe all doubts about this point in favor of the insured parties. *See Saltarelli v. Bob Baker Group Medical Trust,* 35 F.3d 382, 387 (9th Cir.1994).

### c. *The strict liability characterization of the Wolf settlement*

 Lincoln National contends that this Court should ignore the strict liability characterization of the Wolf settlement for two reasons. First, Lincoln National argues that the Wolf Settlement cannot properly be characterized as the settlement of a strict liability cause of action. Second, Lincoln National contends that it cannot be bound by the terms of the Chitkins' settlement with Wolf because Lincoln National was not a party to those proceedings.

Lincoln National argues that the strict liability provided for in *Kriegler v. Eichler Homes, Inc.,* 269 Cal.App.2d 224, 227, 74 Cal.Rptr. 749 (1969), applies only to mass produced items. Since the duck ponds were not mass produced, Lincoln National argues, Wolf could not be strictly liable for Danielle's injuries that resulted from falling in the pond.

Lincoln National's analysis is flawed. California courts did not stop at mass produced items. In *Del Mar Beach Club Owners Assoc., Inc. v. Imperial Contracting Co.,* 123 Cal.App.3d 898, 176 Cal.Rptr. 886 (1981), a California Court of Appeal held that the defendants, who "designed, developed, and constructed" the improvements on real property, could be held strictly liable for defects such as: "the cracking, chipping and peeling of the tennis court surfaces; the rusting and corroding of exterior railings and guardrails; the sinking of the pavement on the east side of the pool; the death of several trees; the subsiding of the grading and paving on the eastern portion of the realty; the leaking of water within the garage and miscellaneous stairwells; and the rusting and corroding of

numerous door and window sills throughout the units." *Id.* at 912–13, 176 Cal.Rptr. 886.

The *Del Mar Beach Club* court relied on *Stuart v. Crestview Mut. Water Co.*, 34 Cal. App.3d 802, 811, 110 Cal.Rptr. 543 (1973). *Del Mar Beach Club,* 123 Cal.App.3d at 913, 176 Cal.Rptr. 886. The *Stuart* case involved a single defective water distribution system. Neither the *Stuart* nor the *Del Mar Beach Club* court appears to have considered whether the defective items were "mass produced."

If a developer can be held strictly liable for game-threatening defects in tennis courts, a developer certainly can be strictly liable for life-threatening defects in duck ponds. The number of duck ponds produced by Wolf is irrelevant. Instead, the only relevant factors appear to be that Wolf had responsibility for producing the ponds and that a reasonable home buyer would not hire its own architect or engineer to evaluate the design of the ponds before purchasing a house in the development. *See Del Mar Beach Club,* 123 Cal.App.3d at 911–12, 176 Cal.Rptr. 886.

■ Lincoln National's argument that it should not be bound by the Wolf settlement because Lincoln National was not a party to the proceedings between the Chitkins and Wolf also fails to persuade this Court that it should ignore the strict liability characterization of the Wolf settlement. The Chitkins argue persuasively that Lincoln National could have asserted some control over litigation between the Chitkins and the tortfeasors by intervening in the litigation. Since Lincoln National did not attempt to intervene, the Chitkins argue, Lincoln National should not be heard to question the terms of the settlement.

California law offered Lincoln National at least a chance to intervene. California Code of Civil Procedure § 387(a) provides, in pertinent part, that "[u]pon timely application, any person, who has an interest in the matter in litigation, or in the success of either of the parties, or an interest against both, may intervene in the action or proceeding." Courts interpreting section 387(a) have found that it vests discretion in the trial court to determine whether to permit intervention. *E.g., California Physicians' Serv. v. Superi-*

*or Ct.,* 102 Cal.App.3d 91, 95, 162 Cal.Rptr. 266 (1980). Before deciding to allow a third party to intervene, courts must find that 1) "the intervener's interest in the litigation must be direct and immediate rather than consequential," 2) "the issues must not be enlarged by the intervention," and 3) "the reasons for intervention must outweigh the rights of the original parties to litigate in their own way." *California Physicians',* 102 Cal.App.3d at 95, 162 Cal.Rptr. 266; *People ex rel. Rominger v. County of Trinity,* 147 Cal.App.3d 655, 660–61, 195 Cal.Rptr. 186 (1983); *Fireman's Fund Ins. Co. v. Gerlach,* 56 Cal.App.3d 299, 128 Cal.Rptr. 396 (1976).

In the case at hand, Lincoln National probably could have met the burden on it to show that it satisfied all three factors. Lincoln National's interest in the litigation obviously was substantial. Characterization of the Chitkin's cause of action against Wolf and the allocation of damages in all but one of the Chitkins' settlements with various tortfeasors have affected Lincoln National's reimbursement right under the plan. In addition, it appears that the same issues probably would have arisen in the underlying litigation had Lincoln National intervened; the issues simply might have been resolved differently. For example, the parties probably would have had to allocate amounts between general and specific damages. The allocation just might have been different with Lincoln National present. Finally, Lincoln National's interests in the settlements probably would have outweighed the interests of the Chitkins and the various tortfeasors in controlling the course of the litigation. The Chitkins had an obvious—though not necessarily cognizable—interest in keeping Lincoln National out of its settlement with Wolf: A settlement premised on strict liability would freeze out Lincoln National's reimbursement right. Wolf might have had a legitimate interest in characterizing the settlement as one for strict liability—a settlement agreement acknowledging negligent conduct might have harmed its ability to obtain insurance at reasonable rates in the future. Nevertheless, Lincoln National's interest in protecting its legitimate reimbursement rights almost certainly would have trumped the Chitkins' and Wolf's

interests in pursuing litigation as they saw fit. In short, Lincoln National cannot say that any efforts it might have made to intervene in the state court proceedings would have been in vain. Unlike the insurance company in *Provident Life & Accident Ins. Co. v. Linthicum*, 930 F.2d 14, 15 (8th Cir. 1991), Lincoln National did not even attempt to intervene in the state court proceedings between the Chitkins and Wolf. Consequently, this Court will not permit Lincoln National to challenge, after the fact, the terms of the settlement, including the strict liability characterization.

### d. *Application of the Return of Over Payment clause to the facts at hand*

The Fourth Circuit articulated a test for unjust enrichment in *Provident Life & Accident Ins. Co. v. Waller*, 906 F.2d 985 (4th Cir.1990). *Waller* involved an ERISA plan, an insurance company, an insured, and a reimbursement provision similar to that in the case at hand. *Id.* at 986. The court explained that "three elements encompass the equitable remedy of unjust enrichment and quasi-contract:"

> the plaintiff must show that (1) he had a reasonable expectation of payment, (2) the defendant should reasonably have expected to pay, or (3) society's reasonable expectations of person and property would be defeated by nonpayment.

*Id.* at 993–94 (citing C. Kaufman, *Corbin on Contracts* § 19A, at 50 (Supp.1989)).

In *Waller*, as in the case at hand, the insurance company did not demand a written reimbursement agreement from the insured before advancing payments for medical care. *Id.* at 986. Nevertheless, the Fourth Circuit held in Provident's favor, noting that "the facts of the instant case fit the archetypal unjust enrichment scenario." *Id.* at 993. The Fourth Circuit found that Provident reasonably expected to be reimbursed; that Waller was aware of the "Acts of Third Parties" provision in the ERISA plan when she requested and accepted benefits; and society's interests in efficient ERISA plan administration would be served by allowing

Provident to obtain equitable relief. *Id.* at 994.

The Chitkins' twelfth affirmative defense is valid in part and invalid in part under the *Waller* court's unjust enrichment analysis. On its face, the reimbursement provision appears to make any funds recovered through settlement subject to Lincoln National's reimbursement right, as long as those settlement funds were not obtained by way of a strict liability settlement. As a result, Lincoln National had a reasonable expectation of repayment from any settlement (with the exception of a strict liability settlement) regardless of any allocation within the settlement. In addition, the Chitkins had at least constructive notice that any amount they might recover would be subject to Lincoln National's reimbursement right. Finally, society would reasonably expect an insurance company to enforce the terms of an ERISA plan. If this Court were to construe the Plan in the manner suggested by the Chitkins, insured individuals could defeat their plan's interests by entering into collusive settlements. Collusive settlements would increase uncertainty, and uncertainty surrounding ERISA plans' rights to repayment ultimately would increase plans' costs, defeating society's reasonable interest in efficient ERISA plans.

The tortfeasors settled with the Chitkins for $3,256,967.20. The parties to the settlements allocated eight percent of each of the settlements (except the Ed and Judy Way settlement) to John and Nancy Chitkin's future wrongful death claims.[9] Of the $2,996,409.82 remaining, $1,794,000 (92% of $1,950,000) came from the Wolf strict liability settlement which is not subject to Lincoln National's reimbursement right. That leaves $1,046,409.82 from which Lincoln National may seek recovery. The Chitkins' attorney received $744,102.45 in attorneys fees on a contingent fee basis for obtaining a $2,996,409.82 recovery for the Chitkins. In other words, he received 24.8% of Danielle Chitkin's total recovery.

---

9. Lincoln National has not challenged the allocation of funds to John and Nancy Chitkin. Lincoln National seeks recovery only from the funds allocated to Danielle.

Using the 24.8% figure, this Court finds that under the terms of the Return of Over Payment provision, Lincoln National must deduct 24.8% from its $701,048.66 reimbursement request to account for its pro rata share of attorneys fees. In other words, Lincoln National is entitled to $701,048.66 minus $173,860.08 (24.8% of $701,048.66) for a total of $527,188.60.

### E. Attorney Fees and Costs

Lincoln National asks this Court to exercise its discretion under 29 U.S.C. § 1132(g)(1) to award it attorneys fees and costs. The Ninth Circuit articulated factors for district courts to consider when ruling on requests for attorney fees and costs in *Hummell v. S.E. Rykoff & Co.*, 634 F.2d 446, 452 (9th Cir.1980). The Ninth Circuit wrote:

> [D]istrict courts should have guidelines to apply in the exercise of their discretion under § 1132(g). They should consider these factors among others: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.

*Id.* at 453. *Accord Losada v. Golden Gate Disposal Co.*, 950 F.2d 1395, 1401 (9th Cir. 1991); *Smith v. CMTA–IAM Pension Trust*, 746 F.2d 587, 590 (9th Cir.1984). The Ninth Circuit also has stated, however, that "[n]o one of the *Hummell* factors ... is necessarily decisive, and some may not be pertinent in a given case." *Carpenters So. Cal. Admin. Corp. v. Russell*, 726 F.2d 1410, 1416 (9th Cir.1984).

In considering a motion for attorneys fees, the district court "should apply its discretion consistent with the purposes of ERISA, those purposes being to protect employee rights and to secure effective access to federal courts." *Smith*, 746 F.2d at 589.

In the case at hand, the *Hummell* factors do not favor Lincoln National. First, Lincoln National argues that the Chitkins have recovered more than $3,200,000 through settlement but refuse to reimburse Lincoln National under the Plan. The Chitkins' refusal to pay, Lincoln National argues, demonstrates their bad faith. This Court, however, does not consider the Chitkins' refusal to forego their defense bad faith conduct. Due process guarantees the Chitkins the right to defend against Lincoln National's law suit, the right to point out the murky language of the Plan, and to challenge Lincoln National's conduct in enforcing the Plan.

As for the second factor, this Court will assume without deciding that the Chitkins could satisfy an award of attorneys fees.

The third factor requires this Court to determine whether an award of fees against the opposing parties would deter others from acting under similar circumstances. In the case at hand, this Court would not want to deter individuals in the Chitkins' position from mounting vigorous defenses. The Chitkins challenged a poorly worded term of a plan and an insurance company's right to recover based on that term. Their efforts might lead to more precision in the drafting of ERISA plans in the future. The Chitkins also raised novel defenses under ERISA and have helped flesh out the law of affirmative defenses under the statute.

The fourth factor favors Lincoln National. Lincoln National sought to enforce a term in an ERISA plan. By demonstrating the validity of the reimbursement provision, Lincoln National demonstrated that ERISA plans may use such cost-saving provisions. Lincoln National clearly took steps toward clarifying significant legal questions about ERISA.

Finally, this Court must consider the relative merit of the parties' positions. Lincoln National convinced two Ninth Circuit judges that it could bring an action for reimbursement. One Ninth Circuit judge and one district judge did not agree. In other words, Lincoln National is far from a clear winner in this case.

Although Lincoln National took steps toward clarifying the law of ERISA, Lincoln National has not shown that the Chitkins did

not also make a contribution to the law or that the Chitkins acted in bad faith in opposing Lincoln National's request for reimbursement. This is an exceptionally close case that has required extensive briefing of a number of complicated issues. The *Hummell* factors do not tip in Lincoln National's favor. Both sides should bear their own attorneys fees and costs.

IV. Conclusion

For the reasons given above, Lincoln National's motion for summary judgment is GRANTED. Lincoln National is entitled to restitution in the amount of $527,188.60. Lincoln National is not entitled to attorneys fees or costs under 29 U.S.C. § 1132(g)(1).

IT IS SO ORDERED.

ATTACHMENT

APPENDIX

On November 24, 1993 the Ninth Circuit issued the following order as a Memorandum:

Before: NORRIS, WIGGINS, and O'SCANNLAIN, Circuit Judges.

This case concerns the interpretation of a provision of an ERISA plan. The district court granted summary judgment in favor of the Chitkins on Lincoln National's counterclaim for reimbursement of money paid to cover their medical expenses. Lincoln National appeals the district court's judgment, and we reverse.

Lincoln National issued a group insurance policy to an ERISA employee benefit plan. Danielle Chitkin, the daughter of plan member John Chitkin, was injured in an accident, and Lincoln National paid $701,048.66 to the Chitkins to cover Danielle's medical expenses. The Chitkins eventually settled their claims against a number of third party tortfeasors, receiving a total of $3,256,967.20. Lincoln National asked the Chitkins to repay the sum they had received from the insurance company. The Chitkins refused. The Chitkins subsequently brought an action against Lincoln National, alleging that the insurer had breached its duties to them by terminating its coverage of the ERISA plan. Lincoln National filed a counterclaim, seeking reimbursement for monies the Chitkins recovered from the settlement with the third party tortfeasors.

The Chitkins argue that Lincoln National lacks standing, under 29 U.S.C. § 1132(a)(3), to bring its counterclaim for restitution of sums advanced because it is no longer a fiduciary of the ERISA plan. We disagree. A fiduciary's responsibilities do not suddenly terminate when the fiduciary ceases to serve as the insurer of the ERISA plan. They continue until all outstanding claims and issues between the insurer and the beneficiaries have been resolved.

The merits of this appeal center around an extremely poorly-drafted provision of the Plan's contract with Lincoln National. The provision states:

Payment made for charges must be returned to Lincoln National if:

. . . . .

2. a third party is determined to be liable for such charges.

If an individual insured under the policy has

a. medical or dental charges ...

as a result of the negligence or intentional act of a third party, and makes a claim to Lincoln National for benefits under the policy for such charges ..., the insured individual or legal representative of minor ... must agree in writing to repay Lincoln National from any amount of money received by the insured individual from the third party, or its insurer. The repayment will be to the extent of the benefits paid by Lincoln National, but will not exceed the amount of the payment received by the individual from the third party, or its insurer....

The repayment agreement will be binding upon the insured individual (or legal representative of a minor ...) whether:

a. the payment received from the third party, or its insurer, is the result of:

1) a legal judgment; or

2) an arbitration award; or

3) a compromise settlement; or

4) any other arrangement

Had Lincoln National been less sloppy in its draftsmanship, we are confident that this entire dispute could have been avoided. Nonetheless, the case before us requires us to interpret the contractual provision as it exists, and it is to that task that we now turn.

The district court concluded, and the Chitkins argue on appeal, that under part 2.a. of the quoted provision, Lincoln National is entitled to reimbursement only if the Chitkins signed a written reimbursement agreement. Because they did not, the Chitkins argue that they are entitled to keep the sum Lincoln National had advanced to them to cover Danielle Chitkin's medical expenses.

The district court treated this contractual provision as if it were designed for the benefit of the Chitkins. We read it differently. In our view, it makes sense only if read as benefitting the insurance company. The provision creates an obligation on the insured, requiring it to sign a written reimbursement agreement as a condition precedent to Lincoln National's obligation to advance funds to cover medical expenses as incurred. Were the insured to refuse to sign such an agreement, it would breach the contract and the insurance company would be excused from its contractual obligation to pay the insured's medical expenses as incurred.

A condition precedent may, of course, be waived, which is precisely what Lincoln National did when it paid the Chitkins' medical expenses even though they did not sign a written reimbursement agreement. That waiver, however, did not transform the condition precedent into a right of the Chitkins to a windfall in the form of a double reimbursement, once from Lincoln National and again from the third party tortfeasors. In other words, there is no plausible justification for allowing the Chitkins to turn the murky contract language to their advantage by using it to defeat Lincoln National's right to recover the money it advanced to them before they were reimbursed by the third party tortfeasors.

The judgment of the district court is REVERSED and the case REMANDED for entry of judgment in favor of Lincoln National.

O'SCANNLAIN, Circuit Judge, dissenting:

We are faced with a reimbursement provision of an insurance policy, issued as part of an ERISA plan, that we all agree is rather poorly drafted. The majority believes, however, that there is only one reasonable interpretation of the provision and therefore reverses and orders that judgment be entered in favor of the insurance company that drafted the provision. I cannot agree with the majority that the insurer's interpretation of the provision is reasonable. For that reason, I respectfully dissent.

To recapitulate, the provision at issue here provides, in pertinent part, that:

Payment made for charges must be returned to Lincoln National if:

. . . . .

2. a third party is determined to be liable for such charges.

*If an individual insured under the policy has*

 a. *medical or dental charges . . .*

 *as a result of the negligence or intentional act of a third party, and makes a claim to Lincoln National for benefits under the policy for such charges . . ., the insured individual (or legal representative of minor . . .) must agree in writing to repay Lincoln National from any amount of money received by the insured individual from the third party, or its insurer . . . .*

The repayment agreement will be binding upon the insured individual (or legal representative of a minor . . .) whether:

 a. the payment received from the third party, or its insurer, is the result of:

 . . .

 3) a compromise settlement

(Emphasis added). While this provision is far from pellucid, it is clear that the insured "must agree in writing to repay Lincoln National from any amount of money received by the insured individual from the third party, or its insurer." Once signed, this repayment agreement is binding on the insured.

I must confess to grave doubts when an insurance company tells me that express language in an ERISA plan drafted by that company serves no true purpose and is to be ignored. At oral argument before this court, Lincoln National was unable to identify for us the purpose underlying the requirement that a repayment agreement be executed by the insured. In fact, Lincoln National insisted that the requirement that a written repayment agreement be executed was merely an "historical relic" which we should disregard. I find Lincoln National's argument rather unpersuasive.

The district court read the reimbursement provision to require execution of a repayment agreement as a prerequisite to recovery. Accordingly, the district court held that Lincoln National's failure to request that the Chitkins sign a repayment agreement prevented the insurer from recovering under this provision of the ERISA plan.[1] The majority concludes that the district court's interpretation of the provision is unreasonable. To reach such a conclusion, the majority must agree with Lincoln National that the express requirement that the insured sign a repayment agreement, quoted above, is of *no* import. We are told, instead, that the *only* language that matters is that which suggests a general obligation to reimburse Lincoln National arises whenever payment is received from a third party. However, the language of the provision expressly indicates that the insured is obligated to sign a repayment agreement. Thus, I cannot agree with Lincoln National's characterization of the reimbursement provision.

We often apply the axiom that when the terms of an insurance policy are ambiguous they are construed against the insurer and in favor of the insured. *See Commercial Union Ins. Co. v. Sponholz*, 866 F.2d 1162, 1163 (9th Cir.1989). Lincoln National suggests that such a presumption carries no force when we interpret a provision in an ERISA plan. Regardless of the validity of that presumption in this context, Lincoln National agrees that we are to "interpret terms in ERISA insurance policies in an ordinary and popular sense as would a person of average intelligence and experience." *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir.1990) (quotation omitted). Here, the reimbursement provision clearly suggests that execution of a written repayment obligation is a prerequisite to reimbursement. I believe that a person of average intelligence and experience would not suspect that the written repayment agreement is merely a meaningless relic. In short, I believe the district court's interpretation of the reimbursement provision was reasonable.

Furthermore, the majority argues that the ambiguous language does serve a purpose, indeed that it is a condition precedent. Ironically, it took the majority to do what Lincoln National itself could not: come up with a justification for its own sloppy contractual language. The majority asserts that the language is a condition precedent but it has created this post hoc rationalization out of whole cloth. Lincoln National never even argued that the language was a condition precedent. Therefore, it is straining credulity to divine that the parties had this justification in mind when they signed this contract. It is incorrect to grant summary judgment to Lincoln National based on a contract interpretation which even it never envisioned.

---

1. Presumably, if the company had requested that the Chitkins sign a repayment agreement prior to its payment of benefits or termination of their coverage and the Chitkins had refused, the Chitkins would have breached the provision and would be liable. The Chitkins concede as much in their brief. Thus, Lincoln National is not left without a remedy if it pays benefits before the execution of a repayment agreement. To receive reimbursement, it must simply request compliance with the provision's requirement before terminating coverage.

Not only do I disagree with the majority that Lincoln National's interpretation is reasonable, I also believe that the majority should have remanded this case for trial rather than ordering summary judgment entered in favor of Lincoln National. *See Evanston Ins. Co. v. Fred A. Tucker & Co., Inc.,* 872 F.2d 278, 279 (9th Cir.1989) ("if, on the face of the contract, two reasonable and fair interpretations are possible, an ambiguity exists"); *International Brotherhood of Elec. Workers v. Southern Cal. Edison Co.,* 880 F.2d 104, 107 (9th Cir.1989) ("When the meaning of an agreement is ambiguous on its face and contrary references as to the intent are possible an issue of material fact exists for which summary judgment ordinarily is inappropriate.") The best that can be said for the policy provision before us is that it is ambiguous. Thus, summary judgment in favor of Lincoln National is inappropriate.

I would go further. I would affirm. It is, it seems to me, more than reasonable to assume that the written repayment agreement requirement exists for a purpose. Thus, I believe that Lincoln National's interpretation, requiring us to read that obligation out of the provision, is simply unreasonable. I refuse to treat the express language of a provision drafted by a sophisticated insurance company as mere surplusage, especially where that language can only confuse plan participants. If the repayment agreement is truly a relic, entirely irrelevant to the insured's reimbursement obligation as Lincoln National contends, then Lincoln National should remove it from the reimbursement provision. *See Slottow v. American Casualty Co.,* 10 F.3d 1355, 1358 (9th Cir.1993). Under these circumstances, I am particularly unsympathetic to Lincoln National's characterization.

Thus, while I join my colleagues in condemning the sloppy drafting of this reimbursement provision, I would do more than express disapproval. I see no reason to rescue Lincoln National from its own careless drafting.

I respectfully dissent.

On March 9, 1994, the Ninth Circuit issued an Order Amending Memorandum, which states:

Before: NORRIS, WIGGINS, and O'SCANNLAIN, Circuit Judges.

The memorandum disposition filed on November 24, 1993 is amended:

The last paragraph is deleted and replaced with: "The district court's grant of summary judgment in favor of the Cbitkins (sic) is reversed. The case is remanded to the district court for further proceedings consistent with this memorandum disposition."